UNITED STATES of America

v.

Quinton R. BRADSHAW.

Civ. No. JH-79-2118.

United States District Court,
D. Maryland.

Sept. 15, 1981.

Russell T. Baker, Jr., U. S. Atty., D. of Md. and Edward M. Norton, Jr., Asst. U. S. Atty., Baltimore, Md., for plaintiff.

J. Edward Martin, Jr. and Allen, Thieblot & Alexander, Baltimore, Md., for defendant.

## MEMORANDUM AND ORDER

HOWARD, District Judge.

This action was brought by the United States against Defendant Quinton R. Bradshaw because he allegedly placed fill material on wetlands without a permit from the United States Army Corps of Engineers in violation of Sections 301(a) and 404(a) of the Federal Water Pollution Control Act ("FWPCA"), as amended, 33 U.S.C. §§ 1311(a) and 1344(a). The United States seeks civil penalties and injunctive relief. The Court's jurisdiction is based on 28 U.S.C. § 1345. A court trial was held on May 6, 1981; the following are the Court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a).

### I. *Factual Background*

The defendant is the owner of the property involved in this action; the property, located in Somerset County, Maryland, borders upon the Ape Hole Creek, a navigable water of the United States.

On the Maryland wetlands maps, the area shown as the "filled area 1978" on Plaintiff's Exhibit ("PX") 5 is designated as wet-

lands. Also, a March 1977 aerial photograph of the Ape Hole Creek area, including the Bradshaw property, indicates that the dominant plant species in "filled area 1978" were those typically found on wetlands: species that require saturated soil conditions and are salt tolerant. The source of moisture for saturated soil, such as the "filled area 1978" and its surrounding marshlands, consists of tidally influenced sub-surface moisture, sheet flow over the marsh during peak high-tide periods, and water from man-made mosquito ditches.

In November 1977, the Defendant placed demolition debris and sand on a portion of the wetlands on his property. *See* PX 5. The fill material had cost the Defendant approximately $1,000 at $20 per load. As a result of the Defendant's action, the existing highland area on the property was increased by about 8,000 square feet. *See* PX 5.

A May 1, 1978 site photograph and an August 1978 aerial photograph show that fill material had been placed on the "filled area 1978" wetlands of the Bradshaw property. PX 5. In fact, Plaintiff's expert, Alex Dolgas, testified that during the week of April 27, 1981, test borings made two and one-half feet below the surface of the filled area recovered marsh peat, a type of wetland vegetation. *See* PX 5 (numbered circles).

Notwithstanding the Defendant's apparently innocent intention of creating a home site by placing the fill material, it is undisputed that wetlands and marshes are the first link in the estuarine food chain and any filling or destruction thereof harms the estuarine environment. At no time did the Defendant obtain the necessary permit for the discharge of fill material. Although he ceased further activity upon notice from the Government, he has refused to restore the filled wetlands. Consequently, the Government brought this action for the restoration of the wetlands on the Defendant's property and other appropriate relief.

1. The regulations were promulgated by the United States Army Corps of Engineers in 1977 to administer and clarify the purposes of the

## II. *Discussion*

The objective of the FWPCA is "... to restore and maintain the chemical, physical, and biological integrity of the Nation's waters," to eliminate the discharge of pollutants into navigable waters, to improve the water quality to assure the protection and propagation of fish, shellfish, and wildlife, and to provide for recreational use. 33 U.S.C. § 1251(a). *See also United States v. Fleming Plantations*, 12 E.R.C. 1705, 1708 (E.D.La.1978).

Under the FWPCA it is unlawful to discharge any pollutant into the waters of United States unless a permit is granted under Sections 402 or 404. *See* 33 U.S.C. § 1311(a).

[1] "Pollutant" is defined as "dredged spoil, solid waste, ... biological materials, ... rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6). The demolition debris and sand used by the Defendant to fill the wetlands are "pollutants" under the Act. *See United States v. Weisman*, 489 F.Supp. 1331, 1337 (M.D.Fla. 1980). Also, Section 404 of the FWPCA which regulates the discharge of dredged or fill material, the regulations[1] thereunder state that:

(m) The term "fill material" means any material used for the primary purpose of replacing an aquatic area with dry land or of changing the bottom elevation of the waterbody.

\* \* \* \* \* \*

(n) The term "discharge of fill material" means the addition of fill material into waters of the United States. The term generally includes, without limitation, the following activities: Placement of fill that is necessary to the construction of any structure in a water of the United States; the building of any structure or impoundment requiring rock, sand, dirt, or other material for its construction; site-development fills for recreational, in-

FWPCA. *See United States v. Fleming Plantation, supra*, at 1708.

dustrial, commercial, residential, and other uses. . .

33 C.F.R. § 323.2(m) and (n). Thus, the Court finds that the fill material is a pollutant as defined in the above regulations.

■ The next issue is whether the Defendant discharged these materials into the "waters of the United States." By the FWPCA, Congress intended to protect the waters of the United States in a plenary, geographic sense, and wetlands are specifically included within that protection. *See United States v. Weisman, supra,* at 1338 (and cases cited therein). The Corps regulations define wetlands as "those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs and similar areas." 33 C.F.R. § 323.2(c). Based on Dolgas's testimony, the aerial and site photographs, and the test borings, the Court finds that "filled area 1978" onto which the Defendant discharged the fill material is wetlands.

The Defendant contends that "fill area 1978" was once highlands which later became marshlands after the construction of mosquito ditches by the Government. Dolgas, however, testified that at most five to ten feet of the land adjacent to the ditches could have been affected. Thus, even assuming the Defendant's contention is true, there is evidence that in 1977 the area where fill material was deposited was wetlands.

■ The Defendant also maintains that he lacked the requisite intent because he was not aware that a permit was required under Section 404 of the FWPCA. The Defendant misapprehends the intent requirement. In *United States v. Alleyne,* the court rejected a similar contention and noted that the mere fact that it was reasonably foreseeable that placing fill in the river would obstruct navigation satisfied the intent element. 454 F.Supp. 1164, 1170–1171 (S.D.N.Y.1978). Here the Court finds the defendant intended to discharge fill material on wetlands when he placed the debris and sand on the marshlands of his property.

Accordingly, the Court finds that "filled area 1978" was wetlands prior to Defendant's deposit of fill material thereon and that the fill material was in fact "pollutant" under the FWPCA. The Court thus concludes that Defendant's discharge of fill material on the wetlands without a permit was in violation of Sections 301(a) and 404 of the FWPCA.

### III. *Remedies*

■ Although the Government seeks civil penalties against the Defendant, the Court finds it unnecessary to impose any because the Defendant immediately ceased his activities upon notice of a possible violation.

■ The Government also seeks the restoration of the filled wetlands to its original condition but has not submitted any proposals or plans for such an operation. In *United States v. Sexton Cove Estates,* the court required that the parties be afforded a hearing to fully develop the merits, demerits, and alternatives to the restoration plan. 526 F.2d 1293, 1301 (5th Cir. 1976). A restoration plan must: (1) confer maximum environmental benefits, (2) be achievable as a practical matter, and (3) bear an equitable relationship to the degree and kind of wrong which it is intended to remedy. *United States v. Weisman,* 489 F.Supp. 1331, 1343 (M.D.Fla.1980).

Therefore, the Court will order the Plaintiff to submit an appropriate plan and supporting memorandum and allow the Defendant to oppose or offer alternatives to that plan.

Accordingly, it is this 15th day of September, 1981, by the United States District Court for the District of Maryland,

ORDERED:

1. That the Defendant is hereby enjoined from further filling or construction activities within or on the borders of Ape Hole Creek and its adjacent wetlands;

2. That the Plaintiff is to submit an appropriate plan with supporting memorandum on or before October 19, 1981;

3. That the Defendant is to reply to the Plaintiff's proposal on or before November 20, 1981; and

4. That the Clerk of the Court mail copies of this Memorandum and Order to all parties.