HOFFMAN HOMES, INCORPORATED, formerly known as Hoffman Group, Petitioner,

v.

ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent.

No. 90–3810.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 5, 1991.

Decided July 19, 1993.

William K. Reilly, E.P.A., Daniel W. Pinkston (argued), Dept. of Justice, Land & Natural Resources Div., Washington, DC, Thomas J. Martin, Jr., E.P.A.; Region 5, Office of Regional Counsel, Chicago, IL, Catherine Winer, E.P.A., Office of Gen. Counsel/Water Div., Washington, DC, for E.P.A.

Ronald A. Zumbrun, Robin L. Rivett, James S. Burling, Charles A. Klinge, Pacific Legal Foundation, Sacramento, CA, for Pacific Legal Foundation, amicus curiae.

William A. Butler, Douglas W. Smith, Jack Chorowsky, Powell, Goldstein, Frazer & Murphy, Washington, DC, for Eight Wetland Scientists, amicus curiae.

Before MANION, Circuit Judge, WOOD, Jr., Senior Circuit Judge,* and ROSZKOWSKI, Senior District Judge.**

HARLINGTON WOOD, Jr., Senior Circuit Judge. .

A tremendous amount of effort has gone into trying to determine whether a small wetland near Chicago may be regulated under the Clean Water Act.[1] After having issued, then vacated, one opinion on this subject, we hope now to resolve this difficult question.

## I. BACKGROUND

On March 26, 1986, an employee of the Army Corps of Engineers was driving through the Village of Hoffman Estates, Illinois. The employee happened to see that work had begun in a former soybean field on a new subdivision called "Victoria Crossings." The subdivision would occupy a 43–acre square parcel which is bordered on the west by the Schaumburg Branch of Poplar Creek, on the east by a road, on the north by

---

* Judge Wood, Jr., assumed senior status on January 16, 1992, which was after consideration of this case.

** Hon. Stanley J. Roszkowski, Senior District Judge for the Northern District of Illinois, sitting by designation.

1. The effort is not entirely that of the parties and the court. We acknowledge receipt of amicus curiae briefs by the Pacific Legal Foundation and Eight Wetland Scientists.

another subdivision, and on the south by a wetland and a road.

The Corps investigated the site; it determined that the subdivision's owner, Hoffman Homes, Inc. ("Hoffman"), had violated the Clean Water Act ("CWA" or "Act"), 33 U.S.C. § 1251 *et seq.*, when it filled and graded parts of the site in preparation for construction. Specifically, the Corps felt Hoffman illegally filled two wetlands, "Area A" and "Area B."

Area A was a bowl-shaped depression at the northeast border of the tract that covered approximately one-acre. The basin was lined with relatively impermeable clay; before being filled by Hoffman, Area A collected rain water and snow melt and frequently ponded or saturated during wet weather. Area A contained at least four different types of wetland vegetation, including cattails. Area A was not directly connected to any body of water, either on the surface or by groundwater, and lay approximately 750 feet from Poplar Creek. Area B ran along the entire western and most of the southern borders of the tract. This wetland covered 13.3 acres, of which Hoffman had filled 5.9 acres. Area B is part of a 50–acre wetland area adjacent to the Poplar Creek. The creek flows into the Fox River which is a tributary of the Illinois River which empties into the Mississippi River.

Having been designated as wetlands pursuant to 33 C.F.R. § 328.3(b), the sites could not legally be filled unless Hoffman obtained a permit pursuant to 33 U.S.C. § 1342 or § 1344. On May 30, 1986, the Corps issued a cease and desist order to Hoffman. This order instructed Hoffman to stop filling wetlands at the site and to apply for an after-the-fact permit to fill the areas. Hoffman did so. The Environmental Protection Agency ("EPA" or "Agency"), which shares responsibility with the Corps for administering and enforcing the CWA, then objected to Hoffman's plans for mitigating the damage to the wetlands. Consequently, on November 20, 1987, the Corps denied Hoffman's permit application and referred the matter to the EPA.

The EPA on December 22, 1987, issued a compliance order pursuant to 33 U.S.C. § 1319(a). The order stated that Hoffman had filled wetlands without a permit, thereby violating 33 U.S.C. § 1311. The compliance order directed Hoffman to cease its filling activities and to submit and carry out a plan to restore the wetlands to their original condition. On January 12, 1988, the EPA also issued an administrative complaint against Hoffman, pursuant to 33 U.S.C. § 1319(g), seeking a $125,000 penalty for Hoffman's filling activities. Hoffman answered the complaint, admitting it had filled the two areas but denying they were waters subject to the CWA. On October 24, 1988, hearings commenced before an EPA Administrative Law Judge ("ALJ"). The hearings lasted a total of twenty-one days but did not run consecutively. The final hearing was held January 19, 1989.

On August 4, 1988, while the hearings before the ALJ were still proceeding, Hoffman brought an action in district court seeking a declaration of the compliance order's invalidity and an injunction against its enforcement. At that time the EPA had not yet decided whether to enforce its compliance order by bringing an action in a federal court pursuant to 33 U.S.C. § 1319(b). Consequently, the district court dismissed Hoffman's action in January 1989. The district court held that the CWA precluded pre-enforcement review of the EPA's compliance order. *See Hoffman Group, Inc. v. United States E.P.A.,* No. 88 C 6695, 1989 WL 165265 at *20003, 1989 U.S. Dist. LEXIS 16,599, at *2 (N.D.Ill. Jan. 23, 1989). Hoffman appealed the district court's decision and we affirmed. We explained that Hoffman was not entitled to judicial review unless the EPA either assessed administrative penalties against Hoffman or sought judicial enforcement of its compliance order. Until such time, Hoffman was not subject to penalties or an injunction for not obeying the EPA's compliance order. *See Hoffman Group, Inc. v. E.P.A.,* 902 F.2d 567, 568 (7th Cir.1990).

Shortly after our decision Hoffman became entitled to judicial review. On November 19, 1990, the EPA's Chief Judicial Officer ("CJO") assessed a $50,000 fine against Hoffman for having discharged "dredged or fill material" into Area A without a permit in

violation of 33 U.S.C. § 1311 and § 1314 and affirmed another $50,000 penalty against Hoffman for filling Area B.

In fining Hoffman for filling Area A, the CJO was reversing the ALJ. On September 14, 1989, in the ALJ's "Initial Decision," the ALJ had found that although Area A was a wetland it was not subject to the CWA's permit requirements. The ALJ characterized Area A as being "isolated." Initial Decision at 48. The EPA had not shown, the ALJ found, that Area A had any surface or groundwater connection with Poplar Creek. In the ALJ's opinion, the Agency also failed to show that Area A performed flood control or sediment trapping in connection with drainage into or the possible flooding of the creek. *Id.* at 45. Instead, the ALJ found that water drained into Area A from the immediately surrounding area, collected there, and then slowly evaporated or dissipated. *Id.* at 47. "There is also no basis for determining if Area A has any effect on the Schaumburg Branch [of Poplar Creek], because it simply cannot be determined what the drainage or flow of water would be if Area A were not there." *Id.*

The ALJ recognized that under EPA and Corps regulations, Area A would be subject to the CWA permit requirements if the wetland affected interstate commerce, *see* 40 C.F.R. § 230.3(s)(3), 33 C.F.R. § 328.3(a)(3), and further noted that the EPA and Corps consider a wetland to affect interstate commerce if, for instance, the wetland serves as habitat for migratory birds. Initial Decision at 48. The ALJ, however, found the EPA had not presented evidence of actual use by migratory birds of Area A nor of any special characteristics that would attract migratory birds to Area A.

Since there was nothing more "than the theoretical possibility" Area A would be used by migratory birds, the ALJ found the regulations did not apply. *Id.* at 49. The EPA appealed the ALJ's decision to the CJO. The EPA, however, did not challenge the ALJ's findings regarding Area A's hydrological isolation; the Agency only challenged the ALJ's conclusion that given those findings the regulations were inapplicable to Area A.

The CJO held that the EPA could not assert jurisdiction over "an isolated, intrastate water body" unless it could demonstrate "that the destruction of that water body will have an effect on interstate commerce." Final Decision at 9. To satisfy its burden of proof, the CJO required the EPA to "show some minimal, potential effect on interstate commerce." *Id.* This effect was shown, the CJO concluded, when the EPA demonstrated Area A provided "a suitable habitat for migratory birds before it was filled in." *Id.* at 2. The CJO noted that Area B supported migratory bird habitat and by its proximity Area A could as well. *Id.* at 30.

Hoffman appealed the CJO's decision regarding Area A, but not Area B, to this court. We exercised jurisdiction pursuant to 33 U.S.C. § 1319(g)(8)(B). The developer contended the CWA did not give the EPA regulatory authority over Area A. The EPA maintained it had jurisdiction due to the potential use of Area A by migratory birds. We held the EPA's regulations went beyond the limits of the Clean Water Act and the commerce clause, U.S. Const. art. 1, § 8, cl. 3. Accordingly, on April 22, 1992, we vacated the EPA's $50,000 penalty against Hoffman for filling Area A. *See Hoffman Homes, Inc. v. Administrator, United States E.P.A.*, 961 F.2d 1310, 1321–23 (7th Cir. 1992).

The EPA then filed a petition for rehearing and suggested the rehearing be conducted *en banc.* On September 4, 1992, we granted the petition for rehearing and vacated our opinion and order. We further ordered that the matter be referred to our senior staff attorney, Donald J. Wall, for the purpose of conducting settlement negotiations between the parties pursuant to Federal Rule of Appellate Procedure 33 and Circuit Rule 33. *See Hoffman Homes, Inc. v. Administrator, United States E.P.A.*, 975 F.2d 1554, 1554 (7th Cir.1992). Since that time, Mr. Wall has conferred with counsel to the parties on numerous occasions. On March 25, 1993, he informed the court that the parties were unable to reach a settlement

and further negotiations would be futile.[2] The matter is thus back in the hands of the original panel which heard the oral arguments on this case nearly two years ago.

## II. DISCUSSION

Hoffman Homes does not dispute that the EPA and the Corps have correctly characterized Area A as a wetland pursuant to 33 C.F.R. § 328.3(b) and 40 C.F.R. § 230.3(t). Nor does Hoffman deny having filled Area A. Hoffman disputes only that the small wetland can be regulated under the Clean Water Act.

Congress's objective in enacting the Clean Water Act was "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To that end, the CWA prohibits "the discharge of dredged or fill material into the navigable waters" without a permit. *Id.* § 1344(a). The CWA defines "navigable waters" as meaning "the waters of the United States, including the territorial seas." *Id.* § 1362(7).

The CWA, though, does not define the term "waters of the United States." The EPA and the Corps have done so in two identically worded regulations. According to the EPA and the Corps, "waters of the United States" includes, among other things, bodies of water wholly within a state whose use or misuse could affect interstate commerce:

(s) The term *waters of the United States* means:

(3) All other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce including any such waters:

(i) Which are or could be used by interstate or foreign travelers for recreational or other purposes; or

(ii) From which fish or shellfish are or could be taken and sold in interstate or foreign commerce; or

(iii) Which are used or could be used for industrial purpose by industries in interstate commerce;

40 C.F.R. § 230.3(s)(3) (EPA's definition); 33 C.F.R. § 328.3(a)(3) (Corp's definition).

The EPA's Chief Judicial Officer ruled that the regulation extended to Area A by virtue of the wetland's potential effect on interstate commerce. It was not necessary under the regulation, the CJO held, that the EPA show an actual effect on interstate commerce. The CJO noted the EPA's regulation explicitly forbids the "degradation or destruction" of intrastate wetlands when such actions "could affect" interstate commerce: "The use of the word 'could' means that EPA need not show an actual effect on interstate commerce. Showing a potential effect will suffice." Final Decision at 11.

Our job is to determine whether (i) the EPA properly interpreted 40 C.F.R. § 230.3(s)(3) and (ii) whether the CJO's finding of a violation of the CWA is supported by "substantial evidence." *See* 33 U.S.C. § 1319(g)(8) (mandating standard of review); *Arkansas v. Oklahoma,* —— U.S. ——, ——, 112 S.Ct. 1046, 1060, 117 L.Ed.2d 239 (1992).

■ Regarding the first question, we have stated that "[a]n agency's construction of its own regulation binds a court in all but extraordinary cases." *Homemakers N. Shore, Inc. v. Bowen,* 832 F.2d 408, 411 (7th Cir. 1987); *accord United States v. Baxter Healthcare Corp.,* 901 F.2d 1401, 1407 (7th Cir.1990) (court gives great deference to agency's interpretations of its own regulations). We must uphold the EPA's interpretation of 40 C.F.R. § 230.3(s)(3) "unless it is plainly erroneous or inconsistent with the regulation." *United States v. Larionoff,* 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48 (1977) (citation omitted); *accord Wisconsin Elec. Power Co. v. Reilly,* 893 F.2d 901, 907 (7th Cir.1990).

■ Hoffman Homes has failed to persuade us the EPA has misread 40 C.F.R.

**2.** Mr. Wall's communication to the court was limited solely to reporting the fact that settlement negotiations had been conducted but were unsuccessful.

§ 230.3(s)(3). The regulation speaks of regulating wetlands and other bodies of water whose use, degradation or destruction "could" affect interstate commerce. This includes waters "which are or *could* be" used by interstate travellers, "[f]rom which fish or shellfish are or *could* be taken," and which "are used or *could* be used" for industrial purposes. *Id.* (emphasis added). We agree with the CJO that the use of the word "could" indicates the regulation covers waters whose connection to interstate commerce may be potential rather than actual, minimal rather than substantial.

 We also agree with the CJO that it is reasonable to interpret the regulation as allowing migratory birds to be that connection between a wetland and interstate commerce. Throughout North America, millions of people annually spend more than a billion dollars on hunting, trapping, and observing migratory birds.[3] Yet the cumulative loss of wetlands has reduced populations of many bird species and consequently the ability of people to hunt, trap, and observe those birds. *See North American Waterfowl Management Plan* 1 (1985); *cf. Palila v. Hawaii Dep't of Land & Natural Resources,* 471 F.Supp. 985 (D.Haw.1979) (protecting endangered bird preserves interstate commerce in species and interstate movement of persons wishing to study species), *aff'd,* 639 F.2d 495 (9th Cir. 1981). *See generally United States v. Byrd,* 609 F.2d 1204, 1209 (7th Cir.1979) (Congress's commerce clause power "has come to mean that Congress may regulate activities which *affect* interstate commerce.").

 Next we must determine whether the CJO's finding of a violation of the regulation is supported by "substantial evidence." The Supreme Court recently emphasized in *Arkansas v. Oklahoma,* —— U.S. ——, 112 S.Ct. 1046, 117 L.Ed.2d 239 (1992), that a "court reviewing an agency's adjudicative action should accept the *agency's* factual findings if those findings are supported by substantial evidence on the record as a whole." *Id.* —— U.S. at ——, 112 S.Ct. at 1060. "Substantial evidence is more than a mere scintilla. It

means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. National Labor Relations Board,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938).

 We obviously do not need to examine the EPA's finding that Hoffman filled Area A; Hoffman has admitted this act. We must ask, however, if the EPA's finding that Area A, before being filled, was a suitable or potential habitat for migratory birds is supported by substantial evidence. The ALJ, as noted earlier, found there was no evidence that any migratory birds actually used Area A. The witnesses the EPA presented only testified as to seeing migratory birds at Area B. The ALJ also found the EPA had failed to present any evidence "that Area A contains any characteristic that would render it any more attractive to birds than any other land that at one time or another contains water." Initial Decision at 48. The ALJ concluded: "It has not been shown by the preponderance of the evidence that Area A has characteristics whose use by and value to migratory birds is well established and that it is likely that it will be used by migratory birds." *Id.* at 50.

Despite the ALJ's findings, the CJO concluded that on the same evidence Area A was a site suitable to migratory birds. Final Decision at 26. First, the CJO noted that Area A was located relatively close to Area B which itself was part of a fifty-acre wetland area and bordered Poplar Creek. Five witnesses testified before the ALJ as to the numerous migratory bird species they had spotted at Area B, including white egrets, blue herons, green herons, Canada geese, mallard ducks, red-winged blackbirds, and mourning doves. *Id.* at 27 n. 25. The CJO reasoned that if Area B would support those migratory birds then Area A would as well.

The CJO based this conclusion in part on the transcripts of testimony of two witnesses, Gerald Bade, a fish and wildlife biologist with the United States Fish and Wildlife Service, and Douglas Ehorn, an EPA water quality

---

3. Congress has long recognized the importance of preserving migratory birds. In 1918 Congress approved the Migratory Bird Treaty Act, 16 U.S.C. § 703 *et seq.,* and in 1929 it passed the Migratory Bird Conservation Act, 16 U.S.C. § 715 *et seq.*

specialist. In the CJO's words, "Bade ... testified that the value of Wetland B as a suitable habitat for migratory birds would be replicated at Area A." Ehorn stated it was a "good possibility" migratory birds would use Area A.

Based on our examination of the record, we find the CJO's conclusion that Area A was suitable for migratory bird habitat to be unsupported by substantial evidence on the record as a whole. Bade, for example, testified as to what he had seen at Area B and not Area A. His testimony as to the suitability of Area A was merely speculation based on the assumption that Area A was a wetland similar to Area B. In contrast to Area B, Area A does not border a stream, it does not adjoin a large wetland, its only source of moisture is rainfall, it is only wet part of the year, and it covers approximately one acre instead of fifty.

Bade, moreover, admitted that Victoria Crossing would have a low waterfowl value because of the lack of open water. Similarly, Ehorn said he never observed any large waterfowl at the site. Dana Sanders, a plant ecologist associated with the Corps, also testified and characterized Area A as having only "moderate" suitability as a resting place for migratory birds.

It is true, of course, that migratory birds can alight most anywhere. As Gerald Bade testified, he has seen mallards in parking lot puddles. The ALJ, however, was in the unique position to view the evidence, to hear the testimony, and to judge the credibility of the witnesses. He concluded that the evidence did not support the conclusion that Area A had characteristics whose use by and value to migratory birds is well established. We agree. The migratory birds are better judges of what is suitable for their welfare than are we, the ALJ or the CJO. Having avoided Area A the migratory birds have thus spoken and submitted their own evidence. We see no need to argue with them. No justification whatsoever is seen from the evidence to interfere with private ownership based on what appears to be no more than a well intentioned effort in these particular factual circumstances to expand government control beyond reasonable or practical limits.

After April showers not every temporary wet spot necessarily becomes subject to government control.

## III. CONCLUSION

Almost one hundred years ago the Supreme Court characterized wetlands as "the cause of malarial and malignant fevers" and opined that "the police power is never more legitimately exercised than in removing such nuisances." *Leovy v. United States,* 177 U.S. 621, 636, 20 S.Ct. 797, 803, 44 L.Ed. 914 (1900). We know now that wetlands are not nuisances but instead are vital to the well-being of both humans and wildlife. Nonetheless, it is our conclusion based on the particular facts and findings below that Area A is not subject to regulation under the Clean Water Act. For this reason we vacate the EPA's order requiring Hoffman Homes, Inc. to pay a $50,000 administrative penalty for the filling of Area A.

VACATED.

MANION, Circuit Judge, concurring in the judgment.

I agree with the court's conclusion that the EPA has no authority to regulate Area A, but for different reasons. I would vacate the EPA's order in this case for the reasons set out in *Hoffman Homes, Inc. v. EPA,* 961 F.2d 1310 (7th Cir.1992) (since vacated). I incorporate by reference that previously published opinion as my concurrence, subject to the following additional comments.

I agree with the court's holding that the CJO did not misconstrue the EPA's permit regulation, 40 C.F.R. § 230.3(s)(3). That regulation provides that the EPA has jurisdiction over all wetlands "the use, degradation, or destruction of which could affect interstate or foreign commerce." The CJO interpreted this regulation to give the EPA jurisdiction over any wetland that could have a "minimal, potential effect" on interstate commerce. This construction is reasonable, given that it is consistent with the regulation's assertion of jurisdiction over wetlands that "*could* affect interstate commerce." To overturn the CJO's interpretation of the regulation would be inconsistent with the great

deference we give to an agency's interpretation of its own regulations.

The regulation reflects the EPA's position that the Clean Water Act gives it jurisdiction over all "waters"—including wetlands within reach of the Commerce Clause. Does the Clean Water Act give the EPA jurisdiction over Area A? Area A is an "isolated wetland," and isolated wetlands by definition have no effect on the waters of the United States. That definition is not pulled from thin air; rather, it is the EPA's own definition. The ALJ found that Area A has no surface or ground water connection to any other body of water, does not perform any water quality functions as to any other body of water, and is not actually used as a wildlife habitat. The EPA has never challenged these findings, and the CJO did not alter or discard them. Thus, the ALJ's findings are the EPA's findings; in other words, the ALJ's definition of "isolated wetlands" is the EPA's definition.

It follows from the EPA's own definition of "isolated wetlands" that regulating Area A does not further the Clean Water Act's purpose to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." See 33 U.S.C. § 1251. Therefore, the Clean Water Act does not give the EPA authority to regulate Area A, even if the Commerce Clause allows Congress to regulate isolated wetlands. See 961 F.2d at 1312–16 for a fuller discussion of the Clean Water Act's construction.

But even if the EPA were correct that the Clean Water Act authorizes regulation of isolated wetlands, I would still vacate the EPA's order in this case. For reasons stated in the previous panel opinion in this case, I would hold that the Commerce Clause does not empower Congress to regulate isolated wetlands such as Area A. See 961 F.2d at 1316–23. To hold otherwise would be, in effect, to hold that Congress' power under the Commerce Clause is virtually limitless. The commerce power as construed by the courts is indeed expansive, but not so expansive as to authorize regulation of puddles merely because a bird traveling interstate might decide to stop for a drink.