**LESLIE SALT CO., a Delaware corporation; Cargill, Inc., Plaintiffs–Appellants,**

v.

**UNITED STATES of America, Defendant–Appellee.**

No. 93–15932.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 14, 1994.

Decided May 22, 1995.

Edgar B. Washburn, Washburn, Briscoe & McCarthy, San Francisco, CA, for plaintiffs-appellants.

David C. Shilton, U.S. Dept. of Justice, Washington, DC, for defendant-appellee.

Before LAY,* PREGERSON, and O'SCANNLAIN, Circuit Judges.

O'SCANNLAIN, Circuit Judge:

We must decide whether to revisit an issue previously resolved by this court—whether isolated, seasonally dry intrastate waters used only by migratory birds are within the regulatory reach of the Clean Water Act. We also decide whether, in the event of violations of the Act, civil fines are mandatory or discretionary.

I

Cargill, Inc., the corporate successor to Leslie Salt Co., owns a 153–acre tract of land southeast of San Francisco. The property abuts the San Francisco Bay National Wildlife Refuge and lies near Newark Slough, a tidal arm of San Francisco Bay. A road divides the property into a 143–acre parcel and a 10–acre parcel. Until 1959, Leslie Salt used the property for salt manufacturing. The eastern part of the 143–acre parcel still contains pits that were used to collect calcium chloride, and the western part contains shallow basins that were used for crystallizing salt.

This appeal centers on 12.5 acres out of the 143–acre parcel, on which the former crystallizers and calcium chloride pits still lie.

---

* The Honorable Donald P. Lay, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.

During much of the year, these areas are dry. During the winter and spring, however, rainwater creates temporary ponds. Migratory birds use these ponds for habitat. The dispute in this case began in 1985, when Leslie Salt began digging a feeder ditch and a siltation pond on its property and began discharging fill that affected the seasonally ponded areas.

## A

Under the Clean Water Act ("the Act"), the discharge of any "pollutant"—which includes dredged or fill materials—into "navigable waters" is forbidden unless authorized by a permit issued by the Army Corps of Engineers (the "Corps"). 33 U.S.C. §§ 1311(a), 1344(a), 1362(12). "Navigable waters" is defined in the Act as "waters of the United States." 33 U.S.C. § 1362(7). The Act provides no further guidance as to what these terms encompass. The Corps has promulgated regulations defining "waters of the United States" as:

(1) All waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;

\* \* \* \* \* \*

(3) All *other waters* such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, *the use, degradation or destruction of which could affect interstate or foreign commerce* including any such waters:

(i) Which are or could be used by interstate or foreign travelers for recreational or other purposes; or

(ii) From which fish or shellfish are or could be taken and sold in interstate or foreign commerce; or

(iii) Which are or could be used for industrial purposes by industries in interstate commerce.

33 C.F.R. § 328.3(a) (emphasis added). *See also* 40 C.F.R. § 230.3(s)(3) (EPA's identical definition).

In the preamble to the 1986 regulations, the Corps suggested that "waters of the United States" also includes waters:

a. Which are or would be used as habitat by birds protected by Migratory Bird Treaties; or

b. Which are or would be used as habitat by other migratory birds which cross state lines; or

c. Which are or would be used as habitat for endangered species; or

d. Used to irrigate crops sold in interstate commerce.

51 Fed.Reg. 41,217 (1986). This preamble material has never been subjected to notice-and-comment procedures and has not been promulgated as an official regulation. The predicate for jurisdiction over the seasonally ponded areas still in dispute in this case is their status as "other waters" which are used as habitat by migratory birds.

## B

Upon learning that Leslie Salt was discharging fill that affected the seasonally ponded areas, the Corps issued a cease and desist order under section 404 of the Act. Leslie Salt filed suit challenging the Corps' jurisdiction over the property. The United States also brought an enforcement action, which was consolidated with Leslie Salt's suit.

The district court originally held that the Corps had no jurisdiction over Leslie Salt's property. *Leslie Salt Co. v. United States,* 700 F.Supp. 476 (N.D.Cal.1989) (*"Leslie Salt I"*). On the issue that is currently before this court, the district court held that the temporary ponds in the crystallizers and the pits were not "other waters" under 33 C.F.R. § 328.3(a)(3), because they had been artificially created and were dry much of the year.

On appeal, this court reversed and remanded. *Leslie Salt Co. v. United States,* 896 F.2d 354 (9th Cir.1990), *cert. denied,* 498 U.S. 1126, 111 S.Ct. 1089, 112 L.Ed.2d 1194 (1991) (*"Leslie Salt II"*). The court held, among other things, that the fact that the crystallizers and pits were artificially made and dry part of the year did not exclude them from being "other waters." *See id.* at

359–60. The court also held that "[t]he commerce clause power, and thus the Clean Water Act, is broad enough to extend the Corps' jurisdiction to local waters which may provide habitat to migratory birds and endangered species." *Id.* at 360. The court thus reversed and remanded for a factual determination of which parts of Leslie Salt's property had sufficient connections to interstate commerce to be subject to the Corps' jurisdiction under the Act.

On remand, the district court found that roughly 12.5 acres of seasonally ponded areas, primarily in the calcium chloride pits, were subject to jurisdiction. *Leslie Salt Co. v. United States,* 820 F.Supp. 478 (N.D.Cal. 1992) ("order for judgment") (*"Leslie Salt III"*). The court justified this holding by referring to the evidence summarized in the United States' Memorandum on Remand. *See id.* at 480. Among other things, this Memorandum states that some 55 species of migratory birds use the seasonally ponded areas as habitat. The court also held that Leslie Salt violated the Act in three of these areas by discharging fill or altering structures without a permit at specific points. Finally, in proceedings addressing the issue of remedies, the court ruled that penalties are mandatory under section 309(d) of the Act when a violation has been found, and that the United States was entitled to injunctive relief to restore the property to its preexisting condition. *See id.* at 483–84 ("order regarding remedies"). The parties subsequently stipulated to a penalty of $50,000 and a restoration plan. The stipulation preserved Cargill's right to appeal the issue of whether penalties are mandatory.

## II

■ Cargill urges this court to revisit the *Leslie Salt II* court's determination that the Corps' jurisdiction under the Act reaches isolated waters used only by migratory birds. Under law of the case doctrine, however, one panel of an appellate court will not reconsider matters resolved in a prior appeal to another panel in the same case. *Kimball v. Callahan,* 590 F.2d 768, 771 (9th Cir.), *cert. denied,* 444 U.S. 826, 100 S.Ct. 49, 62 L.Ed.2d 33 (1979); 18 Charles Alan Wright,

Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 4478, at 788 (1982). In the subsequent appeal, "[t]he scope of review is narrowed to the limitations of the remand." *Adamian v. Lombardi,* 608 F.2d 1224, 1228 (9th Cir.1979), *cert. denied,* 446 U.S. 938, 100 S.Ct. 2158, 64 L.Ed.2d 791 (1980).

In *Leslie Salt II,* a panel of this court held that "[t]he commerce clause power, and thus the Clean Water Act, is broad enough to extend the Corps' jurisdiction to local waters which may provide habitat to migratory birds and endangered species." 896 F.2d at 360. The court remanded only for a "factual determination of the sufficiency of the property's connections to interstate commerce." *Id.* at 361. Thus, the validity of the "migratory bird rule" was established in the first appeal, and this court's review should generally be limited to the issues decided on remand—the property's specific connections to interstate commerce due to migratory bird use. However, Cargill does not appeal the district court's factual findings.

■ Instead, Cargill first claims that this court should not apply law of the case because the panel in *Leslie Salt II* upheld the migratory bird rule in "a bare conclusion" and "without any discussion." Admittedly, a more detailed explanation for such a significant holding might have been more illuminating. However, Cargill's argument fails for two reasons. First, the panel's holding, though succinct, was addressed in a separate section of the opinion, specifically referred to the migratory bird examples in the preamble to the 1986 regulations, and was supported by citations to relevant case law. *Leslie Salt II,* 896 F.2d at 360. Judge Rymer's dissent in *Leslie Salt II* challenged the majority on precisely this point, which shows that the panel was aware of the issue. *See id.* at 361–62 n. 1. Second, "even summarily treated issues become the law of the case." *Alliance for Cannabis Therapeutics v. DEA,* 15 F.3d 1131, 1135 (D.C.Cir.1994). This court has followed law of the case even where the first panel's holding was "cryptic and somewhat ambiguous." *Hanna Boys Ctr. v. Miller,* 853 F.2d 682, 687 (9th Cir.1988). *See also Christianson v. Colt Indus. Operating Corp.,* 486

U.S. 800, 817, 108 S.Ct. 2166, 2178, 100 L.Ed.2d 811 (1988) ("[T]he law of the case turns on whether a court previously decide[d] upon a rule of law ... not on whether, or how well, it explained the decision.").

■ The law of the case doctrine is not an absolute bar to reconsideration of matters previously decided. The doctrine "merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power." *Messenger v. Anderson*, 225 U.S. 436, 444, 32 S.Ct. 739, 740, 56 L.Ed. 1152 (1912). Thus, the court may reconsider previously decided questions in cases in which there has been an intervening change of controlling authority, new evidence has surfaced, or the previous disposition was clearly erroneous and would work a manifest injustice. *Merritt v. Mackey*, 932 F.2d 1317, 1320 (9th Cir.1991); 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, § 4478, at 790.[1] Cargill's substantive arguments are essentially an attempt to show that this court's decision in *Leslie Salt II* was clearly erroneous. This court will address the merits of Cargill's claims only so far as necessary to determine whether the matter settled in *Leslie Salt II* should be reconsidered. *See Merritt*, 932 F.2d at 1320.

### III

Cargill makes several substantive and procedural challenges to the validity of the migratory bird rule. Because law of the case applies to these claims, Cargill must show not only that the *Leslie Salt II* court's holding regarding the migratory bird rule was wrong, but that it was clearly wrong. *See Merritt*, 932 F.2d at 1322.

### A

■ Cargill claims that the preamble to the 1986 regulations promulgated a rule without notice and comment as required by the Administrative Procedure Act. 5 U.S.C. § 553. It is undisputed that the preamble has not been subjected to notice and comment.

■ The *Leslie Salt II* court did not expressly address this claim in its opinion. However, the briefs and other materials submitted to that court reveal that it was aware of both the arguments and the cases relied upon by Cargill. "The law of the case applies to 'issues decided explicitly or by necessary implication in this court's previous disposition.'" *Hanna Boys Ctr.*, 853 F.2d at 685 (quoting *Liberty Mutual Ins. Co. v. EEOC*, 691 F.2d 438, 441 (9th Cir.1982)). By holding that use by migratory birds could form a sufficient connection to interstate commerce to support jurisdiction, the *Leslie Salt II* court implicitly rejected all arguments that the rule is invalid for procedural reasons under the Administrative Procedure Act as well.

The merits of Cargill's claim turn on whether the migratory bird examples in the preamble are characterized as a substantive rule or an interpretive rule. A substantive rule is one that imposes "general, extra-statutory obligations pursuant to authority properly delegated by the legislature." *Alcaraz v. Block*, 746 F.2d 593, 613 (9th Cir.1984) (quotation omitted). An interpretive rule is one that merely explains "what the administrative officer thinks the statute or regulation means." *See id.* at 613. A substantive rule must be subjected to notice and comment procedures, 5 U.S.C. § 553, but an interpretive rule need not. *Id.* at § 553(b)(3)(A).

The United States contends that the migratory bird examples are an interpretive rule because they merely set out the Corps' understanding of the statutory term "waters of the United States." The United States gains support for its position from *Hoffman Homes, Inc. v. EPA*, 999 F.2d 256, 261 (7th Cir.1993), in which the Seventh Circuit held that it was reasonable for the EPA to interpret 40 C.F.R. § 230.3(s)(3) as allowing migratory birds to form the connection between

---

1. The first two circumstances do not apply in this case. The evidence considered on remand was largely the same as the evidence in the first trial. Although Cargill claims the law has changed because the Corps has not subjected the migrato-

ry bird rule to notice and comment, this is actually just a continuation of the status quo. Regardless, it does not constitute controlling authority in this case.

"other waters" and interstate commerce.[2] The court noted that millions of dollars are spent on hunting, trapping, and observing migratory birds, and that the destruction of wetlands impinges on that commerce. *See id.* at 261. By holding that the "other waters" regulation could be read to encompass waters used by migratory birds, the court implicitly treated this as a reasonable interpretation of the statutory term "waters of the United States." By analogy, the migratory bird examples in the preamble could also be seen as merely an interpretation of the Act as opposed to a substantive addition to its reach.

If this court were deciding the issue for the first time, a much more detailed examination of the migratory bird rule's effect on agency decisionmaking might be in order. *See, e.g., Mada–Luna v. Fitzpatrick,* 813 F.2d 1006, 1016 (9th Cir.1987). The court would also have more leeway in its final characterization of the rule. *See, e.g., Tabb Lakes, Ltd. v. United States,* 715 F.Supp. 726, 729 (E.D.Va.1988) (holding "migratory bird rule" invalid as a substantive rule promulgated without notice and comment), *aff'd,* 885 F.2d 866 (4th Cir.1989). However, at this point in the proceedings, the court may address the merits of Cargill's claims only so far as necessary to determine whether the *Leslie Salt II* court was clearly wrong. *See Merritt,* 932 F.2d at 1320. Given that it is plausible to find that the preamble is merely an interpretive rule, and thus not subject to the notice-and-comment requirements of the Administrative Procedure Act, the holding in *Leslie Salt II* cannot be deemed clearly erroneous on this ground.

B

■ Cargill claims that the Corps' interpretation of the Act to extend jurisdiction to habitat used by migratory birds is unreasonable. Cargill attempts to relitigate the *Leslie Salt II* court's holding that: "the Clean Water Act[ ] is broad enough to extend the Corps' jurisdiction to local waters which may provide habitat to migratory birds . . . ."

*Leslie Salt II,* 896 F.2d at 360. Indeed, Judge Rymer's dissent took issue with this part of the holding. *See id.* at 361 n. 1. However, the existence of a dissent, though it may heighten our concerns, does not compel the court to conclude that the decision in *Leslie Salt II* was incorrect. *See Merritt,* 932 F.2d at 1321–22.

Cargill's claim turns on whether the preamble's example of waters "[w]hich are or would be used as habitat by other migratory birds which cross state lines," 51 Fed.Reg. 41,217 (1986), can be seen as a reasonable interpretation of the Act's term "waters of the United States," 33 U.S.C. § 1362(7). "An agency's construction of a statute it is charged with enforcing is entitled to deference if it is reasonable and not in conflict with the expressed intent of Congress." *United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 131, 106 S.Ct. 455, 461, 88 L.Ed.2d 419 (1985) (citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984)).

The reasonableness of the Corps' interpretation must be judged in light of the Act's language, policies, and legislative history. The language of the Act evinces broad congressional purposes that can be cited in support of the Corps' interpretation. For example, section 1251(a)(2) states that it is one of the Act's goals and policies to "provide[ ] for the protection and propagation of fish, shellfish, and wildlife." Similarly, section 1343(c)(1) instructs the EPA, in its formulation of guidelines for determining what constitutes degradation of waters, to consider "the effect of disposal of pollutants on . . . fish, shellfish, [and] wildlife." There is no suggestion in the language of the Act that isolated waters used only by migratory birds fall within its ambit. Nevertheless, the Act's policy of protecting wildlife could plausibly be read to stretch this far.

Clearly the Act fails to mention isolated wetlands. And, to the extent it is relevant, neither does the Act's legislative history from 1972 and 1977. However, legislative history

---

**2.** The EPA and the Corps have concurrent jurisdiction to enforce the Act. 40 C.F.R. § 230.3(s)(3), promulgated by the EPA, is identical to 33 C.F.R. § 328.3(a)(3), which was promulgated by the Corps and is at issue in this case.

from 1972 asserts Congress's intent to extend Act jurisdiction over waters of the United States to the maximum extent possible under the Commerce Clause. S.Rep. No. 1236, 92nd Cong., 2d Sess. 144 (1972) U.S.Code Cong. & Admin.News 1972, pp. 3668, 3776. *See also Rueth v. EPA,* 13 F.3d 227, 231 (7th Cir.1993) (noting "Congress's intent to make the Clean Water Act as far-reaching as the Commerce Clause permits").

The Corps' interpretation also finds some support in the Supreme Court's analysis of the Act. In *United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 131–35, 106 S.Ct. 455, 461–63, 88 L.Ed.2d 419 (1985), the Court held that it was reasonable for the Corps to exercise jurisdiction over wetlands *adjacent* to other waters. The Court cited with apparent approval the Corps' findings that "wetlands ... may function as integral parts of the aquatic environment even when the moisture creating the wetlands does not find its source in the adjacent bodies of water." *Id.* at 135, 106 S.Ct. at 463. The Court also referred to the Corps' assessment that "adjacent wetlands may serve significant natural biological functions, including food chain production, general habitat, and nesting, spawning, rearing and resting sites for aquatic ... species." *Id.* at 134–35, 106 S.Ct. at 463 (quotation omitted). These statements applied to adjacent wetlands, not to isolated, seasonally ponded areas as are at issue in this case. *See id.* at 131 n. 8, 106 S.Ct. at 461 n. 8. The seasonally ponded areas on Cargill's property have no hydrological connection to any other body of water; indeed, for much of the year they do not even exist. Nevertheless, the Corps' rationale for regulating adjacent wetlands may have some application to isolated waters as well. The seasonally ponded areas may have a connection to the aquatic ecosystem in their role as habitat for migratory birds.

Finally, as discussed above, the Seventh Circuit's decision in *Hoffman Homes* supports the notion that it is reasonable to interpret the Act as allowing migratory birds to be the connection between a wetland and interstate commerce. *Hoffman Homes,* 999 F.2d at 261. *See also Utah v. Marsh,* 740 F.2d 799, 803 (10th Cir.1984) (holding that a

lake's presence "on the flyway of several species of migratory waterfowl" was one factor among several supporting Act jurisdiction).

If this court were considering the issue for the first time, Cargill's arguments might well deserve closer consideration. However, in light of the broad purposes evinced by the language of the Act and, to a greater extent its legislative history, and the tangential support found in other cases, the holding in *Leslie Salt II* cannot be considered clearly erroneous on this ground.

## C

█ Cargill claims that, if the migratory bird rule is held to be a reasonable interpretation of the Act, then it would exceed Congress's powers under the Commerce Clause. Again, this is an attempt to relitigate the *Leslie Salt II* court's holding that "[t]he commerce clause power ... is broad enough to extend the Corps' jurisdiction to local waters which may provide habitat to migratory birds and endangered species." *Leslie Salt II,* 896 F.2d at 360. Even Judge Rymer, in dissent, agreed that the commerce power *can* reach regulation of migratory bird habitat; she argued instead that Congress did not intend to extend Act jurisdiction to such an extent. *Id.* at 361 n. 1.

█ A court's review of congressional enactments under the Commerce Clause should be highly deferential. *United States v. Evans,* 928 F.2d 858, 862 (9th Cir.1991). "[A]ctivity that is seemingly insignificant may be regulated [under the Commerce Clause] where one individual's 'contribution, taken together with that of many others similarly situated, is far from trivial.'" *Columbia River Gorge United v. Yeutter,* 960 F.2d 110, 113 (9th Cir.) (quoting *Wickard v. Filburn,* 317 U.S. 111, 127–28, 63 S.Ct. 82, 90, 87 L.Ed. 122 (1942)), *cert. denied,* —— U.S. ——, 113 S.Ct. 184, 121 L.Ed.2d 128 (1992).

One rationale for regulating migratory bird habitat as an element of interstate commerce was expressed by the Seventh Circuit in *Hoffman Homes:* "Throughout North America, millions of people annually spend more than a billion dollars on hunting, trap-

ping, and observing migratory birds. Yet the cumulative loss of wetlands has reduced populations of many bird species and consequently the ability of people to hunt, trap, and observe those birds." *Hoffman Homes,* 999 F.2d at 261.

The Supreme Court has suggested that Congress's commerce clause powers extend to the regulation of migratory birds. In *Hughes v. Oklahoma,* 441 U.S. 322, 329–36, 99 S.Ct. 1727, 1732–36, 60 L.Ed.2d 250 (1979), the Court impliedly said as much when it held that state regulations of intrastate wildlife fall within the ambit of the dormant Commerce Clause. Other courts have also found that the Commerce Clause extends this far. In *Palila v. Hawaii Department of Land and Natural Resources,* 471 F.Supp. 985, 995 (D.Haw.1979), *aff'd,* 639 F.2d 495 (9th Cir.1981), the court, in upholding the Endangered Species Act against a Commerce Clause challenge, stated that "a national program to protect and improve the natural habitats of endangered species preserves the possibilities of interstate commerce in these species and of interstate movement of persons, such as amateur students of nature or professional scientists who come to a state to observe and study these species."

■ The migratory bird rule certainly tests the limits of Congress's commerce powers and, some would argue, the bounds of reason. In this case, there is no evidence of human contact with the seasonally ponded areas. The only humans that hunt or photograph the birds using these ponds apparently are doing so after they have reached other locations. Nevertheless, given the broad sweep of the Commerce Clause, the holding in *Leslie Salt II* cannot be considered clearly erroneous on this ground.[3]

We conclude that reconsideration of *Leslie Salt II* by this panel is inappropriate.

**IV**

PREGERSON, Circuit Judge, with whom LAY, Circuit Judge, concurs:

■ We concur in Judge O'Scannlain's opinion as to Parts I through III. However, we deliver the opinion of the Court as to Part IV, addressing the issue of whether civil penalties are mandatory under section 309(d) of the Act.

Cargill claims the district court erred when it held that section 309(d) of the Act mandates that a civil penalty be imposed for Cargill's violations. *See Leslie Salt III,* 820 F.Supp. at 483–84.

Section 309(d) provides:

Any person who violates [one of the enumerated provisions of the CWA] *shall be subject to a civil penalty* not to exceed $25,000 per day for each violation. In determining the amount of a civil penalty the court shall consider the seriousness of the violation or violations, ... any good-faith efforts to comply with the applicable requirements, ... and such other matters as justice may require.

33 U.S.C. § 1319(d) (emphasis added). The question of whether the Act mandates civil penalties is a question of statutory construction reviewed de novo by this court. *United States v. Richison,* 901 F.2d 778, 780 (9th Cir.1990).

This is an issue of first impression before this court. "In construing statutes in a case of first impression, we first look to the language of the controlling statutes, and second to legislative history." *Central Mont. Elec. Power Coop. v. Administrator of Bonneville Power Admin.,* 840 F.2d 1472, 1477 (9th Cir. 1988). "Absent a clearly expressed legislative intent to the contrary, the plain language must ordinarily be regarded as conclusive." *Id.*

The language of section 309(d) is somewhat odd in that it uses the words "shall be

---

**3.** Cargill also claims that Congress unconstitutionally delegated its legislative powers to the Corps. The vitality of the nondelegation doctrine is questionable, and in the case of the Act, Congress merely left it up to the implementing agencies to define the term "waters of the United States." In light of the underlying policies ex-

pressed in the Act, this is more than the mere "intelligible principle" required to uphold a delegation of legislative power. *Mistretta v. United States,* 488 U.S. 361, 377, 109 S.Ct. 647, 657, 102 L.Ed.2d 714 (1989). *See also Mills v. United States,* 36 F.3d 1052, 1056 (11th Cir.1994) (rejecting non-delegation challenge to the Act).

subject to" instead of saying "shall pay." At first glance, this would seem to mean that while violators are subject to penalty, they may or may not be fined—that is, penalties are discretionary with the district court. However, the Fourth and Eleventh Circuits have held that the use of the words "shall be subject to" means that civil penalties are mandatory under section 309(d). *See Atlantic States Legal Found. v. Tyson Foods, Inc.*, 897 F.2d 1128, 1142 (11th Cir.1990) ("This language makes clear that once a violation has been established, some form of penalty is required."); *Stoddard v. W. Carolina Regional Sewer Auth.*, 784 F.2d 1200, 1208 (4th Cir.1986) ("This language leaves little doubt that, under the circumstances of this case, a penalty in some form is mandated.").

We agree with the other circuits that have held that civil penalties are mandatory under section 309(d). First, as a matter of statutory interpretation, a longstanding canon holds that the word "shall" standing by itself is a word of command rather than guidance when the statutory purpose is the protection of public or private rights. *Escoe v. Zerbst*, 295 U.S. 490, 494, 55 S.Ct. 818, 820, 79 L.Ed. 1566 (1935) (Cardozo, J.). The Act serves precisely such purposes. Second, Congress used less definitive language when it wanted to indicate that penalties are discretionary. Shortly after section 309(d), in section 309(g)(1), Congress used the words *"may ... assess a ... civil penalty"* with regard to administrative actions. 33 U.S.C. § 1319(g)(1) (emphasis added). If Congress had intended civil penalties under section 309(d) to be discretionary, it would have used the word "may" instead of "shall be subject to."

Finally, the fact that civil penalties are mandatory under section 309(d) does not restrain a district court's discretion as significantly as Cargill suggests. District courts retain the broad discretion to set a penalty commensurate with the defendant's culpability. Indeed, in its consideration of the seriousness of a defendant's violations and "such other matters as justice may require," the district court could assess a civil penalty of only a nominal amount.

## V

In sum, we affirm the district court's "order on judgment" on the ground that law of the case bars reconsideration of the validity of the migratory bird rule and that Cargill's challenges to this rule do not demonstrate that the holding of the prior appeal was clear error. To do otherwise would too lightly regard the decision of another panel of this court. Only an en banc court may alter such outcome.

We also affirm the "order regarding remedies" to the extent that it held that civil penalties are mandatory under section 309(d) of the Act.

AFFIRMED.

O'SCANNLAIN, Circuit Judge, dissenting in part:

I respectfully dissent from Part IV of the majority opinion.

Section 309(d) of the Clean Water Act ("the Act") provides:

> Any person who violates [one of the enumerated sections of the Act] shall *be subject to* a civil penalty not to exceed $25,000 per day for each violation.

33 U.S.C. § 1319(d) (emphasis added). The majority reads this language to mean that civil penalties are mandatory for proven violations of the Act. If section 309(d) had provided "Any person who violates ... shall *pay* a civil penalty," I would readily agree with the majority's interpretation. However, it does not so provide, and we cannot ignore the three words following the word "shall." To do otherwise "violates the settled rule that a statute must, if possible, be construed in such a fashion that every word has some operative effect." *United States v. Nordic Village, Inc.*, 503 U.S. 30, 35, 112 S.Ct. 1011, 1015, 117 L.Ed.2d 181 (1991).

Section 309(d) did not use the words "shall pay"; it used the words "shall be subject to." The latter phrase is synonymous with "shall be liable to" or "shall be answerable to." *Black's Law Dictionary* 1278 (5th ed. 1979). Read literally, the section merely states that a violator is liable to be assessed a civil penalty, not that he or she *must* be. In

other words, civil penalties are discretionary. Several district courts facing this question have come to this conclusion as well. *See, e.g., Hawaii's Thousand Friends v. Honolulu,* 149 F.R.D. 614, 617 (D.Haw.1993); *United States v. Bradshaw,* 541 F.Supp. 880, 883 (D.Mass.1981). *See also United States v. Winchester Mun. Util.,* 944 F.2d 301, 306 (6th Cir.1991) (suggesting that district courts that found civil penalties discretionary are correct).

If Congress had meant civil penalties to be mandatory, it could have written section 309(d) to state that a violator "shall pay" a civil penalty. Indeed, these are precisely the words it has chosen in numerous civil penalty provisions. *See, e.g.,* 7 U.S.C. § 1596(a) ("Any person who ... violates any provision of this chapter ... *shall pay* a fine of not more than $1,000 ...") (emphasis added); 26 U.S.C. § 6038(b)(1) ("If any person fails to furnish ... any information ... required under [this section], such person *shall pay* a penalty of $1,000 ...") (emphasis added).

In addition, to the extent it might be relevant, the Act's legislative history reveals no congressional intent whatsoever to make civil penalties mandatory. The House Report to the 1972 Amendments simply states that "the courts are *authorized* to apply appropriate civil penalties under Section 309(d)." H.R.Rep. No. 911, 92nd Cong., 2d Sess. 133 (1972) (emphasis added). It does not suggest that Congress believed the courts are required to do so.

Even if section 309(d) were found to be ambiguous, the rule of lenity should counsel us to choose the interpretation least likely to impose penalties unintended by Congress. *See National Org. for Women, Inc. v. Scheidler,* —— U.S. ——, ——, 114 S.Ct. 798, 806, 127 L.Ed.2d 99 (1994). The rule of lenity has not been limited to criminal statutes, particularly when the civil sanctions in question are punitive in character. *See United States v. Thompson/Center Arms Co.,* 504 U.S. 505, 518 n. 10, 112 S.Ct. 2102, 2110 n. 10, 119 L.Ed.2d 308 (1992). The penalties contemplated by section 309(d) clearly have punitive purposes. *Tull v. United States,* 481 U.S. 412, 422–23, 107 S.Ct. 1831, 1838, 95 L.Ed.2d 365 (1987). Thus, section 309(d)

should not be read to require civil penalties in all cases but only where the district court, in its discretion, finds them appropriate.

Undoubtedly, civil penalties will be imposed in most cases of proven violations of the Act; however, by leaving them to the district court's discretion, more appropriate remedies may be fashioned in exceptional cases. For example, the district court may encounter situations in which the purposes of the Act are better served by seeing to it that the violator undertakes comprehensive corrective actions. *See, e.g., Gwaltney v. Chesapeake Bay Found.,* 484 U.S. 49, 60–61, 108 S.Ct. 376, 382–83, 98 L.Ed.2d 306 (1987) (suggesting that civil penalties might be inappropriate where violator agrees to take some extreme corrective action).

I would therefore reverse the district court's "order regarding remedies" to the extent that it held that section 309(d) of the Act mandated that a civil monetary penalty be imposed for every violation of the Act.