UNITED STATES of America

v.

**RUETH DEVELOPMENT COMPANY, and Harold G. Rueth**

No. 2:96CV540.

United States District Court, N.D. Indiana, Hammond Division.

Sept. 25, 2001.

Order Vacating Order in Part Feb. 21, 2002.

Carol A. Davilo, U.S. Attorney's Office, Dyer, IN, for plaintiff.

Laurence A. McHugh, Barnes and Thornburg, South Bend, IN, Michael L. Muenich, Hand Muenich & Wilk, Highland, IN, Stephen A. Studer, Plews Shadley Racher and Braun, South Bend, IN, for defendants.

## ORDER

MOODY, District Judge.

The United States of America, acting on behalf of the Environmental Protection Agency ("EPA"), moves to enforce a consent decree between EPA and Rueth Development Company and Harold G. Rueth ("Defendants"), entered with this court on January 26, 1999 ("Consent Decree"). Defendants have filed cross-motions for dispute resolution and modification. Since the court feels the parties' briefs are adequate to address all the issues presented, a hearing is not necessary and therefore Defendants' "Request for Evidentiary Hearing on Pending Motions" is **DENIED.** For the reasons that follow, the court **GRANTS** the EPA's motion to enforce the Consent Decree and awards stipulated penalties in the amount of $ 4,018,500 and **ORDERS** Defendants to complete excava-

tion as set forth in the Consent Decree within ninety (90) days of entry of this Order. The court also **GRANTS** Defendants' cross-motion for dispute resolution insofar as it relates to wetland delineation and annual reporting and **DENIES** Defendants' motion to modify the Consent Decree. Since the court has disposed of all issues without reference to Exhibit A to Defendants' Petition for Modification, EPA's "Motion to Strike" is **DENIED AS MOOT.**

## BACKGROUND

On November 1, 1996, EPA filed a civil complaint alleging that Defendants violated sections 301(a) [1] and 404 [2] of the Clean Water Act ("CWA"), by causing unlawful dredging and filling at two parcels in the Castlewood Development, located in southeastern Dyer, Indiana (the "Site"). Prior to trial, Defendants and EPA agreed to settle the case.[3] In accordance with Section XII of the Decree,[4] the Department of Justice solicited public comment on the proposed Consent Decree. *See* Notice of Lodging of Consent Decree Pursuant to the Clean Water Act, 63 Fed.Reg. at 60,-024 (Nov. 6, 1998). The United States received no public comments.[5] The court subsequently entered the Consent Decree on January 26, 1999. It required the Defendants to (1) cease unlawful discharges; [6] (2) restore the property's wetlands in accordance with the "Castlewood Development Wetland Restoration Plan" within the agreed-to timeline; [7] and (3) "pay a civil penalty of $23,500, payable within thirty (30) days of the entry of this Consent Decree." [8] This court retained jurisdiction over the action to enforce, modify, construe and resolve disputes arising out of the Consent Decree.

Now, EPA moves to enforce the Consent Decree. It seeks an order requiring Defendants to complete excavation as agreed in the Consent Decree, as well as stipulated penalties and other appropriate relief. Defendants oppose the United States' motion and themselves move for dispute resolution and modification under the Decree on various grounds.

## JURISDICTION

■ Defendants urge modification of the Consent Decree because "the U.S.

---

**1.** "Except as in compliance with this section and sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title, the discharge of any pollutant by any person shall be unlawful." 33 U.S.C. § 1311(a).

**2.** "The Secretary may issue permits ... for the discharge of dredged or fill materials ... at specific disposal sites." 33 U.S.C. § 1344(a).

**3.** Defendants' counsel signed the Decree on August 3, 1998. The government had three signatories: David Ullrich, Acting EPA Administrator for Region 5 (signed the Decree on September 10, 1998); Steven Herman, EPA Assistant Administrator for Enforcement and Compliance Assurance (September 30, 1998); and Steven Rusak, Department of Justice's Environmental & Natural Resources Division (October 21, 1998).

**4.** Section XII of the Consent Decree provides:

34. Defendants consent to the entry of this Consent Decree without further notice. The parties agree that after the lodging of this Consent Decree, and prior to its entry, the United states shall, pursuant to 28 C.F.R. § 50.7, publish a public notice of this Consent Decree and provide an opportunity for public comments. The United States reserves the right to withhold or withdraw its consent to entry of this Consent Decree based upon such public comments.

**5.** The public comment period was thirty days from the date of publication in the Federal Register. *See id.*

**6.** *See* Consent Decree, at ¶ 15.

**7.** *See id.* at Ex.1 (Plan) & ¶ 16 (Timeline).

**8.** *Id.* at ¶ 17.

EPA and/or U.S. Army Corps of Engineers has lost jurisdiction of the property which is the subject of the Consent Decree." (Def. Pet. for Modification of Consent Decree, at 2.) "[M]odification of a consent decree may be warranted when the ... decisional law has changed to make legal what the decree was designed to prevent." *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 388, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992). By way of "decisional law," Defendants direct the court's attention to the Supreme Court's decision in *Solid Waste Agency v. Army Corps of Engineers*, 531 U.S. 159, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001) ("*SWANCC*"). Since *SWANCC* has narrowed the Army Corps of Engineers' regulatory jurisdiction under the CWA, the court first addresses this part of Defendants' motion.

In *SWANCC*, the Army Corps of Engineers had sought to regulate abandoned sand and gravel pits which had evolved into a scattering of permanent and seasonal ponds. *See id.* at 678. They based jurisdiction solely on the existence of migratory bird species observed at the site (a.k.a. The Migratory Bird Rule). *See id.* The Supreme Court held this exercise of regulatory jurisdiction by virtue of the Migratory Bird Rule, "exceeds the authority granted to [the Army Corps of Engineers] under § 404(a) of the CWA." *Id.* at 684.

In light of *SWANCC*, Defendants urge this court to rule that the Army Corps of Engineers has no power to regulate the Site. There are two fundamental factual differences between Defendants' Site and the real property at issue in *SWANCC*. First, Defendants' Site is home to a natural wetland which flows into connecting bodies of water. (*See* Consent Decree, at Ex. 1.) In *SWANCC*, the bodies of water at issue were isolated mining pits and ponds. In other words, a molecule of water residing in one of these pits or ponds could not mix with molecules from other bodies of water. At Defendants' Site, however, water molecules currently present in the wetlands will inevitably flow towards and mix with water from connecting bodies, including the Little Calumet River. Secondly, the "Migratory Bird Rule" was the *sole* basis of regulatory jurisdiction asserted by the Army Corps of Engineers in *SWANCC*. With respect to Defendants' Site, however, the government has never invoked the Migratory Bird Rule. Instead, the government seeks to regulate the Site on the theory that it is an "adjacent wetland."

Under § 404(a) of the CWA, the Army Corps of Engineers has the power to regulate wetlands adjacent to navigable waterways. *See United States v. Riverside Bayview Homes*, 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985). The holding in *Riverside Bayview Homes*, as reaffirmed in *SWANCC*, turns on "the significant nexus between the wetlands and 'navigable waters.'" *SWANCC*, 121 S.Ct. at 680. Since the *Riverside Bayview Homes* standard remains applicable to wetlands, the court considers whether the wetland on Defendants' Site has a "significant nexus" to a navigable waterway.

Defendants' Site is a wetland which "has an affect on flows to Dyer Ditch, and ultimately the Little Calumet River." (Consent Decree Ex. 1, at 15.) The Little Calumet River is itself a navigable waterway.[9] A drop of rainwater landing in the

9. "Navigable from the Indiana–Illinois State Line for 21.24 river miles to Burns Waterway Harbor; and navigable for an additional 17.75 river miles to its junction (as Kemper Ditch) with Interstate 94. (The river is also navigable in Illinois.)" Natural Resources Commission—Lake Michigan and Other Navigable Waters, at http://www.state.in.us/nrc/policy/III.html.

Site is certain to intermingle with water from the Little Calumet River. The relationship between the wetlands and the navigable waterway is direct. The Site, therefore, has the "significant nexus" to a navigable waterway necessary to trigger Army Corps of Engineers' regulatory jurisdiction under CWA § 404(a).

### THE CONSENT DECREE

A. *Stipulated Penalties for Violations of the Consent Decree.*

The United States seeks enforcement of Article VI of the Consent Decree ("Stipulated Penalties") for Defendants' failure to (1) timely pay the $23,500 fine and (2) complete the agreed upon tasks within the prescribed timeline. Defendants argue Article VI of the Consent Decree is a liquidated damages provision and an unenforceable penalty because the amounts are unconscionable and bear no relation to harm suffered.[10] (*See, e.g.,* Def. Mem. in Opp. to U.S. Motion to Enforce Consent Decree, at 5, 10.)

■ "Although consent decrees have the force of a court order, they are also a form of contract to be construed according to basic principles of contract interpretation." *Ahern v. Board of Educ.,* 133 F.3d 975, 981 (7th Cir.1998). "The source of the obligations in the decree is the parties' will, not federal law." *Kasper v. Board of Election Comm'r,* 814 F.2d 332, 338 (7th Cir.1987). "[T]he intention of the parties is the key to deciding whether a provision is to be considered a penalty or liquidated damages." *United Order of Am. Bricklayers and Stone Masons Union No. 21 v. Thorleif,* 519 F.2d 331, 332 (7 th Cir.1975).

The parties titled Article VI *"Stipulated Penalties* for Future Violations of Consent Decree" (emphasis added) and use the phrase "stipulated penalties" five times in the text of Article VI. There is no evidence, in the text of the Consent Decree, Defendants' briefs or otherwise suggesting an intent to liquidate damages. Therefore, the court finds the parties intended Article VI of the Consent Decree to act as a stipulated penalty and not liquidated damages.

■ The next question is whether the stipulated penalty provision of Article VI is enforceable. In *U.S. v. Krilich,* 948 F.Supp. 719, 726 (N.D.Ill.1996), *aff'd.,* 209 F.3d 968 (7th Cir.2000), *cert. denied sub nom. Krilich v. U.S.,* 531 U.S. 992, 121 S.Ct. 482, 148 L.Ed.2d 455 (2000), the court found "it would not be unconscionable or otherwise inappropriate to have a provision that imposes a penalty" in a consent decree to settle CWA claims. The rationale for imposing the stipulated penalties was that the parties "were reaching a compromise regarding possible statutory penalties." *Id.* Under CWA, the maximum statutory penalty is $ 25,000 per day for each violation. *See* 33 U.S.C. § 1319(d). In light of this maximum penalty, the court concluded it was not unconscionable to enforce the stipulated penalty provision of $ 2,500 per day. *See id.* at 726–27 (imposing stipulated penalties of $ 1,307,500).

Prior to signing the Consent Decree, Defendants had two options available. They could either litigate or settle. Had they litigated, Defendants would have assumed the risk of court-imposed civil pen-

---

10. An Agreement, made in advance of breach, fixing the damages therefor, is not enforceable as a contract and does not affect the damages recoverable for the breach, unless (a) the amount so fixed is a reasonable forecast of just compensation for the harm that is caused by the breach, and

(b) the harm that is caused by the breach is one that is incapable or very difficult of accurate estimation.
RESTATEMENT (SECOND) OF CONTRACTS § 339.

alties of up to $ 25,000 per day for each violation of the CWA.[11] The amount of the penalties would have been a function of factors not within Defendants' direct control. Understandably, Defendants decided they did not want to assume the risk of litigation. By settling, Defendants traded the litigation risk for the certainty of prescribed penalties and definite triggering events. As it turned out, the Defendants and the government agreed upon a schedule of stipulated penalties:

| | |
|---|---|
| A. For day 1 up to and including day 30 of non-compliance | $1,500.00 per day |
| B. For day 31 up to and including day 60 of non-compliance | $2,000.00 per day |
| C. For day 61 and beyond of non-compliance | $2,500.00 per day |

(Consent Decree, at ¶ 19.) Defendants made a rational decision about the risks associated with litigating the case. Defendants arrived at this agreement through arms-length negotiations and they were represented by competent counsel throughout the process. Before entry of the Consent Decree, the court found the terms to be reasonable and fair. (*See* Consent Decree, at pg. 2.) In addition, the stipulated amounts represent a small fraction of the maximum penalty a court might impose under CWA. The court therefore finds the stipulated penalty provision of the Consent Decree is enforceable.

(1) *Payment of $23,500 penalty.*

Defendants had agreed to pay the $23,500 civil penalty no later than thirty days after the court's January 26, 1999 entry of the Consent Decree. On May 4, 1999, Defendants remitted that amount to the government. (*See* Mem. in Support of

U.S. Motion to Enforce the Consent Decree, at Ex. 4.) At no time prior to late payment of this penalty did Defendants exercise their rights under the force majeure provisions of the Consent Decree. *See* Consent Decree at ¶ 24 ("If an event occurs which causes or may cause Defendants to fail to comply fully and timely with any requirement of this Consent Decree, Defendants shall notify in writing EPA and the Department of Justice."). Since Defendants remitted payment 67 days late, Defendants are jointly and severally liable in the amount of $ 122,500.[12]

(2) *Completion of agreed upon tasks.*

■ Defendants also agreed to complete the following tasks:

| Task | Deadline |
|---|---|
| a. Excavation | December 31, 1998 |
| b. Seal seven stormsewer inlets | December 31, 1998 |
| c. Raise one stormsewer inlet | December 31, 1998 |
| d. Replace stormwater pipe with solid pipe or encase in impermeable material | December 31, 1998 |
| e. Initial seeding and planting | April 30, 1999 |

(Consent Decree, at ¶ 16a.) The government asserts Defendants have not adhered to the timeline and they move to enforce the stipulated penalties.

Defendants argue, however, they should be liable for no penalties whatsoever. In particular they claim, "[t]he delay in completion of the excavation task until September 1999 was caused primarily by the fact that four of the deadlines in the Decree had passed at the time the Decree was entered." (Def. Mem. in Opp. to the U.S. Motion to enforce the Consent Decree, at 11.) Defendants had multiple op-

---

**11.** In determining the amount of civil penalty the court shall consider the seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good-faith efforts to comply with the applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice might require.

33 U.S.C. § 1319(d).

**12.** Calculated as follows: $ 45,000 for the first 30 days (at $1,500 per day), plus $ 60,000 for the next thirty days (at $ 2,000 per day), plus $17,500 for the final seven days (at $ 2,500 per day).

portunities to remedy this. Defendants' first chance was to bring its issue with the deadlines to the court's attention before the Consent Decree was entered. Since they expressly assumed the risk of cumbersome governmental procedures,[13] Defendants had the burden of bringing this matter to the court's attention. Second, after the Consent Decree was entered, Defendants had the right to notify the EPA and Department of Justice as prescribed in the force majeure[14] provision of the Consent Decree. Defendants failed to invoke either of these readily-available methods to communicate their need for additional time.

In addition, the court is skeptical that the delay until September 1999 was caused primarily by the government's slow response time. Counsel for Defendants signed the agreement on August 3, 1998.[15] Counsel is therefore presumed to know that (1) the December 31, 1998 deadlines were five months away and (2) the agreement was subject to a public comment period of thirty days. This means that if the government took only thirty days to finalize its approvals and the court instantaneously entered the settlement, Defendants would have had four months from the date of entry until the December 31, 1998 deadline. Had Defendants completed excavation within four months of entry of the Consent Decree, the court could perhaps appreciate Defendants' position that the government's response time was a factor in the excavation delay. Yet, it took *eight months* from the date of entry for Defendants to substantially perform their excavation duty under the Consent Decree. Defendants present no reason why the

court should let Defendants off the hook for stipulated penalties.

Nevertheless, Defendants' point is well taken; EPA must bear some of the burden associated with their unwieldy procedures. On the day the Consent Decree was entered, January 26, 1999, the deadline had already expired for the first four tasks. Under the technical terms of the Consent Decree, stipulated penalties had begun to accrue on December 31, 1998. Clearly, for the court to impose penalties for the period of time before the Consent Decree was entered would be inequitable. The court, therefore, in the exercise of discretion, extends a four month "credit" to Defendants, by calculating stipulated penalties from the date four months (120 days) after January 26, 1999.

### a. Excavation.

■ Defendants agreed to complete excavation no later than December 31, 1998. They began excavation during the week of September 20, 1999. (*See* Mem. in Support of U.S. Motion to Enforce the Consent Decree, at Ex. 9 & 10.) On October 1, 1999, the excavation work was complete. The government notes that only 95% of the work was completed by that time. For that reason, the government also seeks penalties beyond October 1, 1999.

Defendants' completion of 95% of excavation work brought them into substantial compliance with the Consent Decree. The court believes it would be inequitable to bring the full wrath of the penalty provision to bear on Defendants for the period of time after which they were in substantial compliance. The court, therefore, in

---

**13.** "Defendants consent to the entry of this Consent Decree without further notice." (Consent Decree, at ¶ 34.)

**14.** 25. If the parties to this Consent Decree agree that the violation of a provision of this Consent Decree has been or will be caused by

circumstances beyond the control of the Defendants ... the time for performance of such provision shall be extended in writing by EPA for a period equal to the actual delay resulting from such circumstances.

**15.** *See supra* note 3.

the exercise of discretion, will only consider the imposition of penalties up to October 1, 1999.

After applying the four month credit, Defendants were 127 days late in completing the excavation work as agreed in the Consent Decree. Therefore, the court finds the Defendants jointly and severally liable for $ 272,500 [16] in stipulated penalties for the untimely completion of the excavation.

*b. Seal seven stormsewer inlets; c. Raise stormsewer inlet; d. Replace stormwater pipe with solid pipe or encase in impermeable material.*

■ Defendants agreed to seal seven stormsewer inlets, raise a stormsewer inlet and replace a stormwater pipe or encase it with impermeable material, no later than December 31, 1998. Defendants did not complete these tasks until October 1, 2000, 613 days after the Consent Decree was entered. Defendants seek to avoid stipulated penalties for the untimely completion. They assert "the completion of these tasks was delayed by circumstances involving changed facts, and concerns by the Town of Dyer." (Def. Mem. in Opp. to the U.S. Motion to enforce the Consent Decree, at 12.) The force majeure to which the parties agreed was designed to address precisely this situation. *See supra* note 14. Defendants proper remedy for the delays was to assert their rights under the force majeure, not to seek modification of the decree after the fact.[17]

After applying the four month (120 day) credit, Defendants are liable for 493 days of penalties. The court finds Defendants jointly and severally liable in the amount of $ 1,187,500 [18] for each of the three untimely tasks for a total stipulated penalty of $ 3,562,500.

*e. Initial seeding & planting.*

■ Defendants also agreed to complete initial seeding and planting no later than April 30, 1999. Defendants admit the seeding and planting was finalized on October 5, 1999. (*See* Mem. in Support of U.S. Motion to Enforce the Consent Decree, at Ex. 17.) This constitutes a delay of 158 days.

The government also seeks stipulated penalties for Defendants' failure to make timely notification of the seeding and planting. The general purpose of the Consent Decree was to clean up the Site and return it to environmental compliance. The parties agreed to accomplish this through the completion of certain tasks. Defendants have complied with the specific substantive task of seeding and planting but failed to strictly adhere to the notification requirements. Notification requirements serve important objectives and compliance with them is required. Yet, the court will not exercise its equitable powers in favor of imposing additional penalties for merely failing to notify where the substantive portion of the task has been completed. Therefore, the court finds Defendants jointly and severally liable in the amount of $ 61,000.[19]

**16.** Calculated as follows: $ 45,000 for the first 30 days (at $1,500 per day), plus $ 60,000 for the next 30 days (at $ 2,000 per day), plus $ 167,500 for the final 67 days (at $ 2,500 per day).

**17.** In addition, if the court absolves Defendant from the stipulated penalties on the grounds Defendants suggest, the court would be reading the force majeure out of the Consent Decree.

**18.** Calculated as follows: $ 45,000 for the first 30 days (at $1,500 per day), plus $ 60,000 for the next 30 days (at $ 2,000 per day), plus $ 1,082,500 for the final 433 days (at $ 2,500 per day).

**19.** Calculated as follows: $ 45,000 for the first 30 days (at $1,500 per day), plus $ 16,000 for the next 8 days (at $ 2,000 per day).

**B.** *Defendants' Motion for Dispute Resolution.*

Next, the court considers Defendants' Petition for dispute resolution. Defendants seek dispute resolution with respect to the portion of the Consent Decree requiring them to "[c]onduct wetland boundary delineation of areas required to be restored under this consent decree" no later than June 1999. (Consent Decree, at ¶ 16.) Defendants propose a revised deadline for wetland delineation of September 30, 2000. (*See* Def. Pet. for Dispute Resolution under Consent Decree, at ¶ 25.) In the interest of producing an accurate boundary delineation, the court adopts Defendants' proposal for the revised deadline of September 30, 2000. Defendants remain obliged to secure all notifications, approvals and consents as prescribed in the Consent Decree.

Defendants also seek dispute resolution with respect to the portion of the Consent Decree requiring them to "[s]ubmit annual monitoring report[s]" for the five year period ending September 2003. (Consent Decree, at ¶ 16.) Defendants propose that they produce six annual reports, from September 2000 through September 2005, inclusive. (*See* Def. Pet. for Dispute Resolution under Consent Decree, at ¶ 25.) Since an important objective of the Consent Decree is to ensure prospective environmental health of the Site, the court grants Defendants' petition for dispute resolution with regard to the annual monitoring reports.

As for the other issues raised in defendants' Petition for Dispute Resolution, the court has previously addressed them in the discussion of stipulated penalties.

**C.** *Completion of Excavation.*

The government also seeks excavation of the remaining 5% of the Site. This is described as a "115 foot by 40 foot area within the wetland restoration area." (Mem. in Support of U.S. Motion to Enforce Consent Decree, at Ex. 2, ¶ 24.) According to EPA officer Gregory T. Carlson, Defendants had not excavated this area as of September 25, 2000. (*Id.*) Defendants claim they have completed all excavation and there is no duty under the Consent Decree to perform further excavation. They assert the EPA's conclusions about the duty to excavate the 115' × 40' area "were based upon erroneous interpretations of data and of the Restoration Plan." (Def. Mem. in Opp. to the U.S. Motion to Enforce the Consent Decree, 11.)

The affidavit of Defendants' environmental consultant, Eric Ellington, ("Ellington Affidavit") however, suggests the need for additional excavation. In particular, paragraphs 16 and 17 of the Ellington Affidavit refer to requests for "95% completion inspection" and paragraph 20 notes Mr. Carlson of EPA's review and approval of the "95% earthwork completion." This is a clear acknowledgment by Defendants' consultant that Defendants needed to excavate another 5%. Defendants are hereby ordered to do so no later than ninety (90) days from the filing of this Order. If Defendants have already excavated the remaining 5%, they merely need to satisfy the notification and approval requirements of the Consent Decree. If the Defendants have a bona fide dispute over "interpretations of data and of the Restoration Plan," the court refers Defendants to the Dispute Resolution provisions [20] of the Consent Decree.

For the foregoing reasons, **IT IS THEREFORE ORDERED THAT** Defendants are jointly and severally liable for $ 4,018,500 of stipulated penalties for violations of the Consent Decree.

---

**20.** *See* Consent Decree, at IX.

**IT IS FURTHER ORDERED THAT** Defendants complete excavation as required in the Consent Decree no later than ninety (90) days from the date of the issuance of this Order.

**THE COURT FINDS THAT** Defendants substantially complied with their boundary delineation duty by September 30, 2000, **GRANTS** dispute resolution in favor of Defendants by declining to assess stipulated penalties for completion of the aforementioned delineation and **ORDERS** Defendants to comply with all notification and consent requirements relating thereto, as set forth in the Consent Decree.

**IT IS FURTHER ORDERED THAT** Defendants submit annual monitoring reports in accordance with the specifications set forth in the Consent Decree, from September 2000 through September 2005, inclusive.

**IT IS FURTHER ORDERED THAT** Defendants' "Request for Evidentiary Hearing on Pending Motions" is **DENIED.**

**IT IS FURTHER ORDERED THAT** Defendants' "Petition for Modification of Consent Decree" is **DENIED.**

**IT IS FURTHER ORDERED THAT** the "United States' Motion to Strike" is **DENIED AS MOOT.**

**THE CLERK IS DIRECTED TO ENTER JUDGMENT** in favor of the United States of America, against Rueth Development Company and Harold G. Rueth, jointly and severally, in the amount of $ 4,018,500, for stipulated penalties for violations of the consent decree between these three parties entered by this court on January 26, 1999.

**SO ORDERED.**

1. The factual and procedural background are more fully set forth in the court's September 25, 2001 Order.

*ORDER*

Presently before the court for resolution is "Defendants Motion to Alter or Amend Judgment," filed on October 11, 2001. Defendants ask this court to rule that (1) wetland 6 is an "isolated wetland" for purposes of the Clean Water Act ("CWA"), and (2) the Environmental Protection Agency ("EPA") "lacks jurisdiction to seek to enforce the Consent Decree." (Mot. at 1.) For the following reasons, the court **VACATES IN PART** its September 25, 2001 Order, and **DENIES** Defendants' Rule 59(e) motion.

## I. BACKGROUND [1]

On November 1, 1996, EPA filed a civil complaint alleging that Defendants violated CWA, by causing unlawful dredging and filling at two parcels in the Castlewood Development, located in southeastern Dyer, Indiana ("Site" or "Castlewood"). Instead of proceeding to trial, Defendants and EPA settled the suit. The settlement was memorialized in a Consent Decree. Pursuant to Section XII of the Decree, the Department of Justice solicited public comment on the proposed Consent Decree. *See* Notice of Lodging of Consent Decree Pursuant to the Clean Water Act, 63 Fed. Reg. at 60,024 (Nov. 6, 1998). No comments were received. This court subsequently entered the Consent Decree on January 26, 1999. It required Defendants to (1) cease unlawful discharges; (2) restore the property's wetland in accordance with the "Castlewood Development Wetland Restoration Plan" within the agreed-to-timeline; and (3) "pay a civil penalty of $23,500, payable within thirty (30) days of the entry of this Consent Decree." [2]

On the belief Defendants had failed to fully perform their obligations, EPA sub-

2. Consent Decree at ¶ 17.

sequently moved to enforce the Consent Decree. *See* Robert V. Percival, *The Bounds of Consent: Consent Decrees, Settlements and Federal Environmental Policy Making,* 1987 U. CHI. LEGAL F. 327, *available at* WL 1987 UCHILF 327, at 4 ("Once the agreement is embodied in a consent decree, the government may seek relief for a breach of the agreement directly from the court without filing a new lawsuit."). On September 25, 2001, this court granted EPA's motion to enforce the Consent Decree, and lodged a judgment in favor of EPA (and against Defendants) for stipulated penalties. On October 11, 2001, Defendants timely filed a motion pursuant to FED.R.CIV.P. 59(e), arguing the court erroneously awarded the judgment for stipulated penalties because (1) this court drew the wrong factual conclusion about the adjacency of wetland 6 (or, in the alternative, that the court should have conducted a hearing to receive ecological and hydological evidence on the issue), and (2) EPA has no jurisdiction to seek enforcement of the Consent Decree.

## II. LEGAL STANDARD

A party may file a "motion to alter or amend a judgment" within ten days after the entry of such judgment. FED.R.CIV.P. 59(e). The motion must set forth, with "reasonable specification," the grounds upon which the moving party seeks relief. *Talano v. Northwestern Med. Faculty Fdn., Inc.,* 273 F.3d 757, 760 (7th Cir.2001) (mandating a minimum of specificity to trigger FED.R.CIV.P. 59(e) review); *Martinez v. Trainor,* 556 F.2d 818, 819–20 (7th Cir.1977). "A party may not introduce evidence or make arguments in a Rule 59 motion that could or should have been presented to the court prior to judgment." *United States v. 47 West 644 Route 38, Maple Park, Ill.,* 190 F.3d 781, 783 (7th Cir.1999); *see also Caisse Nationale De Credit Agricole v. CBI Indus., Inc.,* 90 F.3d 1264, 1270 (7th Cir.1996); *LB*

*Credit Corp. v. Resolution Trust Corp.,* 49 F.3d 1263, 1267 (7th Cir.1995). "A Rule 59(e) motion may only be granted if there has been a mistake of law or fact or if there is newly discovered evidence not previously available." *Gendron v. United States,* 154 F.3d 672, 675 (7th Cir.1998); *see Figgie Int'l Inc. v. Miller,* 966 F.2d 1178, 1180 (7th Cir.1992).

## III. DEFENDANTS' CONTENTIONS

In their jointly-filed motion, Defendants make two arguments. First, they assert the court prematurely concluded wetland 6 is an "adjacent wetland" and subject to the EPA's regulatory jurisdiction under the CWA. According to Defendants, the court should instead find that the Site is situated upon an "isolated wetland" and therefore beyond the regulatory reach of the CWA. Alternatively, Defendants argue this court should receive expert ecological and hydrological testimony on the issue of whether the Site sits upon an "isolated wetland." Under the circumstances, a Rule 59(e) motion appears to be the proper procedural device to pursue the remedy Defendants seek. Second, Defendants argue that EPA lacks jurisdiction to seek enforcement of the Consent Decree entered by this court. Defendants maintain that intervening United States Supreme Court case law has stripped EPA of regulatory jurisdiction over the Site. According to Defendants, EPA is therefore powerless to petition this court to assess stipulated penalties as provided in the Consent Decree. The court will address each argument in turn.

### A. Wetland 6 is an "isolated wetland"

First, Defendants maintain the Site does not contain an "adjacent wetland." *See* 33 C.F.R. § 328.3(b) (defining "wetlands") & (c) (defining "adjacent"). As previously stated, the court, in its September 25, 2001 order, concluded otherwise. In so doing,

the court referred to EPA's memorandum in support of its motion to enforce the consent decree, particularly Exhibit A thereto, which purports to be "Consent Decree, *United States v. Rueth Development Co.,* Civil Action Number 2:96CV–540–JM, entered January 26, 1999." (Mem. in Supp. of Motion to Enforce Consent Decree, at Index to Exhibits (emphasis in original) ("Memo In Support")) According to this Index of Exhibits, Tab 1 contained the Consent Decree, *and only the Consent Decree.* The court then reviewed the obligations Defendants had agreed to undertake as a result of the Consent Decree. One provision required that "Defendants shall conduct and complete the 'Castlewood Development Wetland Restoration Plan' which is attached to this Consent Decree as Exhibit 1." (Consent Decree at ¶ 16.) The parties also agreed "[t]he 'Castlewood Development Wetland Restoration Plan' shall be an enforceable obligation of this Consent Decree." (*Id.* at ¶ 16.c.) The court, eager to peruse the contents of the "Castlewood Development Wetland Restoration Plan," turned to the rear of Tab 1. Two pages after the signature page for the presiding district judge (*i.e.,* the undersigned) appears a page with the following printed upon it: EXHIBIT 1. (emphasis in original [hereinafter "Tab 1/Exhibit 1"]) The court understood this page to signal the beginning of the "Castlewood Development Wetland Restoration Plan." In other words, it was assumed (albeit subliminally) that on the next page would commence the contents of the "Castlewood Development Wetland Restoration Plan."

The first page of *what is* Tab 1/Exhibit 1 of EPA's Memo in Support (and *what simultaneously purports to be* the "Castlewood Development Wetland Restoration Plan") contains the following statement: "Castlewood is an existing residential subdivision located in Dyer, Indiana, south of U.S. 30 and just west of the Schereville

town line. . . . *Within this proposed development area is a wetland encompassing approximately 7.3 acres.* The existence of this wetland necessitates this assessment." (emphasis added) The fourth paragraph on that first page states: "The proposed development area was naturally undulating but has been modified by past sand and/or gravel mining activities. Therefore, some areas are scraped and others contain indiscriminate spoil piles. *In the center of the property is a large wetland of about 7.3 acres.*" (emphasis added) The court further proceeded to study the "exhibit" and noted the following two sentences:

> The topographic map of the area (St. John, Indiana) shows that the natural drainage is to the north to Dyer Ditch, then to Hart Ditch and the Little Calumet River. Shallow wetlands existed along this natural drainage, but the spoil piles interrupted that water flow and dammed the valley to create the deeper wetland.

(Tab 1/Exhibit 1 at 10.) Continuing with its review of the document, the court took special note of two portions printed within the section entitled "Discussion and Recommendations." First, this section provided the following conclusion: "The wetland on the Castlewood property provides habitat for numerous wildlife species. *It also has an affect on flows to Dyer Ditch, and ultimately the Little Calumet River.*" (Tab 1/Exhibit 1 at 15 (emphasis added).) The "Discussion and Recommendations" section further determined that "[t]he Castlewood wetland is under the jurisdiction of the U.S. Army Corps of Engineers under Section 404 of the Clean Water Act of 1972." (*Id.* at 16.) This document clearly indicates that one wetland is present on the Site, water molecules that collect in the wetland ultimately come in contact with water molecules from the Little Calumet

River,[3] and that the wetland is subject to federal regulatory jurisdiction pursuant to CWA § 404.

Armed with the ecological and hydological conclusions embodied in Tab 1/Exhibit 1, the court then referred back to the body of the Consent Decree proper. Since the court was lead to believe that the contents of Tab 1/Exhibit 1 were the "Castlewood Development Wetland Restoration Plan," (Consent Decree at 3.), and that the "Castlewood Development Wetland Restoration Plan," is "an enforceable obligation," (id. at ¶ 16.c.), this court concluded that the set of ecological and hyrdological propositions contained in Tab 1/Exhibit 1 were previously agreed upon. Proceeding under the assumption EPA and Defendants had both subscribed to these ecological and hydrological findings, the court found that no factual dispute could possibly exist on issues relating to the wetland. Based upon what the court perceived to be mutual understandings, it was concluded that the wetland present upon the Site is an "adjacent" (and not an isolated) wetland for purposes of CWA. (See Sept. 25, 2001 Order at 4–5 (citing Tab 1/Exhibit 1).) This precluded Defendants from establishing what they believe is vital to their case, namely that the wetland that is the subject of this litigation is not the kind of ecological system that is within the regulatory purview of CWA.

In Defendants' memorandum in support of their Rule 59(e) motion, they inform the court that it "misinterpreted Exhibit 1 to the Consent Decree, and ignored disputed issues of fact." (Mem. in Supp. of Mot. at 4.) Neither of these characterizations is entirely true, but prompted the court to investigate the source of Defendants' discontent. First, the court did not ignore a disputed factual question because, as mentioned supra, based upon the documents the parties presented, there appeared to be no material fact in dispute. Second, the court did not misinterpret "Exhibit 1 to the Consent Decree." The court merely arrived at its decision by reference to the documents submitted by the parties, working under the assumption the documents were indeed what they purported to be. In fact, upon (another) review of that document, it is clear the court properly interpreted its contents.

The element of truth to which the court referred comes in when a subsequent review of EPA's submission reveals that it perpetrated a "bait and switch" of sorts. The document upon which this court so heavily relied, "Tab 1/Exhibit 1" is not what it purports to be. In the place where the "Castlewood Development Wetland Restoration Plan" was supposed to be (i.e., right after the page with the symbols "EXHIBIT 1" printed upon it) was a report prepared by Elizabeth Secora McCloskey ("McCloskey Report").[4] The bona fide "Castlewood Development Wetland Restoration Plan" appears nowhere in the EPA's package of exhibits annexed to its Memo in Support of the Motion to Enforce the Decree. That is no small accomplishment: EPA annexed seventeen exhibits, not one of them was the "Castlewood De-

3. The court took judicial notice of the fact that the Little Calumet River is a navigable waterway. See FED.R.EVID. 201(c) ("A court may take judicial notice, whether requested or not.").

4. Defendants drove this point home in their memorandum.

The Consent Decree in this case is attached as Exhibit 1 to the Plaintiff's "Memorandum in Support of United States' Motion to Enforce the Consent Decree." Exhibit 1 to the Decree, attached by the government, is entitled "Environmental Assessment, Castlewood Edition, Dyer, Indiana," dated February 21, 1990, prepared by Elizabeth Secora McCloskey.

(Mem. in Supp. of Rule 59(e) Mot. at 3 (emphasis added).)

velopment Wetland Restoration Plan." Failing to include the "Castlewood Development Wetland Restoration Plan" as the real Exhibit 1 to the Consent Decree was the "bait" half of the operation, inserting the McCloskey Report, was the "switch." Surprisingly, in the ten months and roughly half-dozen filings between EPA's tendering of the "bait and switch" exhibit and this court's September 25, 2001 Order, Defendants failed to provide a true, accurate, and complete copy of the Consent Decree (and proper exhibits thereto), and/or bring the court's attention to the fact that the Consent Decree annexed to EPA's memorandum is *very misleading*. In its response to this Rule 59(e) motion, EPA recognizes this mistake. (Resp. at 5, fn.2 ("[The McCloskey Report] was incorrectly attached as Exhibit 1 to the Consent Decree... Ms. McCloskey's report should have been attached as Exhibit 1 to the Declaration of Gregory T. Carlson.").)

As a result, Defendants have clearly met their burden of demonstrating to the court that the parties never achieved mutual assent on the contents of the McCloskey Report, which undergirds this court's previous finding that the wetland at issue in this litigation is an "adjacent wetland" as that phrase is used in CWA jurisprudence. This court, therefore, **VACATES** the portion of its September 25, 2001 Order finding of an "adjacent wetland" upon the Site.

### B. Whether EPA lacks jurisdiction to seek to enforce the Consent Decree

Even assuming Defendants can show that wetland 6 is an "isolated wetland" for purposes of CWA, the inquiry does not end. Such a finding does not automatically undercut the validity of the Consent Decree, or the supplemental judgment resulting from this court's grant of EPA's motion to enforce the Consent Decree. Rather, Defendants must now demonstrate that, as a result of wetland 6 being an "isolated wetland," EPA "lacks jurisdiction to seek to enforce the Consent Decree." (Def. Mem. in Supp. of Mot. at 19.) Defendants jurisdictional argument flows from the United States Supreme Court decision in *Solid Waste Agency of Northern Cook County v. Army Corps of Engineers*, 531 U.S. 159, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001) (5–4 decision) ("*SWANCC*").

In *SWANCC*, a group of suburban Chicago municipalities decided to purchase some real property located in Cook and Kane counties. *See id.* at 678. The owner at the time, Chicago Gravel·Company, had previously used the parcel for sand and gravel pit mining operations, but ceased those operations there about 1960. *See id.* In the intervening decades, "the old mining site eventually gave way to a successful stage forest, with its remnant excavation trenches evolving into a scattering of permanent and seasonal ponds of varying size and depth." *Id.* (parentheticals omitted). As a result of the presence of these bodies of water, the defendants contacted the Army Corps of Engineers ("ACOE") and inquired whether these man-made bodies were subject to federal regulation under CWA, and if so, whether "a federal landfill permit was required." *Id.* ACOE eventually asserted jurisdiction because migratory birds were observed at the site. *See id.* In common parlance, this is the Migratory Bird Rule. *See* 51 Fed.Reg. 41,217. Notwithstanding its diligent attempts to secure the applicable CWA permit, ACOE refused to grant one. The municipalities then filed suit in district court, pursuant to the Administrative Procedures Act, 5 U.S.C. § 701 *et seq.*, "challenging both the [ACOE] jurisdiction over the site and the merits of its denial of the ... permit." *Id.* at 679. ACOE secured a summary judgment in its favor on the jurisdictional issue and the municipalities abandoned their challenge to the denial of the permit. *See*

*id.* The Seventh Circuit affirmed, rejecting the position that ACOE "had exceeded their statutory authority in interpreting the CWA to cover nonnavigable, isolated, intrastate waters based upon the presence of migratory birds." *Id.* The Supreme Court granted *certiorari.*

The Supreme Court, in its five-to-four decision, reversed the Seventh Circuit. The Court determined the promulgation of the Migratory Bird Rule, was beyond the authority Congress had bestowed upon ACOE. *See id.* at 684. Since the Migratory Bird Rule was the sole basis upon which ACOE asserted regulatory jurisdiction over the real property at issue, the Court ruled the municipalities were entitled to judgment as a matter of law.

Defendants argument based on *SWANCC* is fairly straightforward. They assert that just like the real property in *SWANCC,* the Site's wetland 6 is not an "adjacent wetland," and therefore no CWA jurisdiction exists. According to Defendants, this means the court should alter the supplemental judgment entered in this case on September 25, 2001. A fair reading of *SWANCC,* however, indicates it is sufficiently distinguishable, and does not form a basis for Rule 59(e) relief.

There is a fatal difference in procedural posture. When faced with the prospect of regulation under CWA § 404(a), the municipalities in *SWANCC* could have acquiesced, settled with ACOE, and developed the real property consistent with ACOE specifications. Instead, the municipalities made a rational determination that the expected benefits derived from fully litigating the jurisdictional issue outweighed the expected detriment. From the municipalities' perspective, it "made sense" to litigate rather than forfeit the right to contest the jurisdictional issue and come to a negotiated settlement. *See* Percival, *supra,* at *8 ("Parties ordinarily can be expected to settle a lawsuit only if the terms of the settlement are more favorable than the expected outcome of a trial discounted by the additional costs of continuing the litigation." (citing William M. Landes, *An Economic Analysis of the Courts,* 14 J.L. & ECON. 61, 66–69 (1971))).

Defendants charted a different course, which naturally, yielded different results. To fully appreciate the difference in procedural posture between *SWANCC* and this case requires a return to January 1991. At that time ACOE notified Defendants "that its activities at the Castlewood site were resulting in the unauthorized discharge of fill materials into wetlands." *Rueth v. EPA,* Civ. A. No. H91–152, 1992 WL 560944 at *1 (N.D.Ind. Nov.24, 1992) (Lozano, J.), *aff'd,* 13 F.3d 227 (7th Cir. 1993). Three months later, EPA issued an administrative order, indicating Defendants violated the anti-dumping provisions of the CWA. EPA also mandated a restoration of the wetland to its previous condition. *See id.* Less than one month after the administrative order issued, Defendants filed suit requesting a declaration that ACOE "does not have jurisdiction over the property at issue." *Id.* Judge Lozano dismissed the action for lack of subject matter jurisdiction, holding that administrative agency orders "are not reviewable until the enforcement stage." *Id.* at *2. Judge Lozano also provided guidance on the availability of a federal judicial forum.

> Developers, when confronted with the [ACOE] preliminary determination of jurisdiction over land, may react in two ways. They may submit to the administrative permitting process and subsequently, through the Administrative Procedure Act, 5 U.S.C. § 704, obtain judicial review of a permitting decision (a final agency action) under the arbitrary and capricious standard. Or, they may ignore the agency and risk compli-

ance orders followed by enforcement penalty proceedings, and obtain *de novo* review in district court. Either of these two options, in any event, affords the developer his or her day in court.

*Id.* at *3 (citation to *Banks v. Page,* 768 F.Supp. 809 (S.D.Fla.1991) omitted). Dissatisfied with this outcome, Defendants appealed, and (as indicated by the citation to the district court opinion, *supra* ) the Seventh Circuit affirmed. In so doing, the panel made some observations bearing on the issue presently before this court.

We acknowledge that our holding places Rueth somewhat in limbo until such time as the EPA seeks to enforce the compliance order or assess administrative penalties. In the interim, we are cognizant of the fact that Rueth might conceivably encounter some problems, such as securing bank loans or obtaining title insurance. Responsibility for this predicament does not fall entirely on the EPA and the [ACOE], as any reasonable and experienced developer such as Rueth should have known that the wetlands were potentially subject to regulation. Perhaps Rueth is in its present predicament because it attempted to short cut and take an end-run around the permit requirement. Indeed, the prudent course for any developer is to secure the necessary permits prior to commencing construction. This is what the Clean Water Act mandates in [33 U.S.C.] § 1344(a) when it requires developers to obtain permits prior to filling wetlands. Of course, Rueth now argues that it had no idea the wetlands at the Castlewood development were "waters of the United States." As our decision in *Hoffman Homes, Inc. v. EPA,* 999 F.2d 256, 261 (7th Cir.1993), makes clear, however, nearly all wetlands fall within the juris-

diction of the CWA since one test for whether the wetland affects interstate commerce is whether migratory birds use the wetland. *Id.* Decisions such as *Hoffman Homes,* give full effect to Congress's intent to make the Clean Water Act as far-reaching as the Commerce Clause permits. On the other hand, it is not inconceivable that the EPA or the [ACOE] might completely overextend their authority. In such a case, we suggest to those agencies that we will not hesitate to intervene in pre-enforcement activity, but this is not the case as we are of the opinion that the wetland at issue falls under the broad definition of "waters of the United States" in *Hoffman Homes.*

*Rueth,* 13 F.3d at 230–31 (dicta). Based upon this round of litigation, a rational business manager in Defendants' position would have impounded the following information into the operating calculus of the firm: (1) that Defendants would have a federal judicial forum available to contest the jurisdictional issue (either offensively, in a suit against EPA pursuant to the Administrative Procedures Act;[5] or defensively, in an action brought by EPA against Defendants for violations of CWA); and (2) that based upon the law of this circuit, Defendants' chances of succeeding with the jurisdictional challenge were slim.

On November 1, 1996, EPA filed a civil complaint alleging Defendants violated CWA sections 301(a) and 404. At that moment, Defendants were faced with a choice. Defendants could have contested the EPA's regulatory jurisdiction, thereby encountering certain risks. First, based upon the Seventh Circuit's dicta, Defendants chances of succeeding were not good. Second, the costs (in attorneys'

---

**5.** This was the procedural device employed by the municipalities in *SWANCC.* 121 S.Ct. at 679.

fees, expert witnesses, discovery, etc.) of pursuing the jurisdictional issue would be substantial. Last, contesting EPA's jurisdiction could have thwarted attempts to negotiate a settlement. The municipalities in *SWANCC* chose this risky route, whereas Defendants, approached the problem in a more risk averse manner. They agreed to settle the litigation (and have that settlement embodied in the Consent Decree).[6] This decision is perfectly understandable. Defendants felt the jurisdictional issue was a "loser,"[7] and the costs of what appeared to be protracted litigation would be prohibitive. *Cf.* Percival, *supra* at *2 ("Joint gains from settlement are possible because settlements save the parties the expense of further litigation."). Defendants decision, however, was not without costs of its own. First (and fatally for purposes of this motion), Defendants *waived* certain rights. *See generally id.* at *2 ("Each party gives up something it might have won had the litigation continued."). "Waiver is the intentional relinquishment or abandonment of a known right." *United States v. Williams*, 272 F.3d 845, 854 (7th Cir.2001); *see also United States v. Olano*, 507 U.S. 725, 733, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). By assenting to settlement in this action,[8] Defendants waived, for example,

the right to contest the EPA's regulatory jurisdiction, which would have been an element of the EPA's substantive claim. *See United States v. Krilich*, 209 F.3d 968, 972 (7th Cir.2000) ("[T]he interstate connection, *i.e.* that the waters involved were 'waters of the United States,' is merely an element of the United States' Clean Water Act case under section 301."), *cert. denied*, 531 U.S. 992, 121 S.Ct. 482, 148 L.Ed.2d 455 (2000); *see also United States v. Wilson*, 133 F.3d 251, 264 (4th Cir.1997) (indicating proof of interstate nexus is an element of criminal liability under CWA); *United States v. Ahmad*, 101 F.3d 386, 391 (5th Cir.1996) (recognizing the existence of "purely jurisdictional elements").

Moreover, a consent decree "is an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is *subject to the rules generally applicable to other judgments and decrees.*" *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 378, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992) (emphasis added). In this case, EPA moved to enforce the judgment entered by way of the Consent Decree. As a result of EPA's motion, this court lodged a supplemental judgment in favor of EPA. Defendants, in their Rule 59(e) motion, seek to alter the latter of the

---

6. Presumably, Defendants could have reserved the right to contest EPA's jurisdiction over the Site. Alternatively, Defendants could have negotiated a provision in the Consent Decree allocating rights and obligations of the parties in the event case law in this circuit changed. This latter approach was taken by the developer in *United States v. Krilich*, 152 F.Supp.2d 983 (N.D.Ill.2001), *appeal docketed*, No. 01–2746 (7th Cir. July 3, 2001). In the *Krilich* consent decree, the parties made the following agreement:

> 20A. The Defendants shall continue to treat wetland and open water areas depicted on Exhibit 1 as waters of the United States until the mandate issues in *Hoffman Homes, Inc. v. EPA*, 961 F.2d 1310 (7th Cir.1992) and until proceedings related to

any appeal, petition for certiorari, or remand are completed. Following completion of these proceedings, unless pertinent portions of the Seventh Circuit's April 20, 1992 decision are reversed, Exhibit 1 areas W2A, W2B, W3, W5B, and W9 shall be excluded from the obligations imposed in Paragraph 17.

*Id.* at 990.

7. *But see SWANCC*, 121 S.Ct. at 684 (reversing Seventh Circuit).

8. *See* Consent Decree at ¶ 5 ("This Consent Decree shall constitute a complete and final settlement of all civil claims against the Defendants in connection with Defendants' alleged violations of the CWA as set forth in the Complaint.").

two judgments entered in this cause, but since the latter judgment is merely the result of exercising rights contained in the earlier judgment, Defendants must also attack the former judgment (or more specifically, rights therein allocated to EPA), which is exactly how Defendants cast their argument. (*See* Rule 59(e) Mot. at 1 (EPA "lacks jurisdiction to *seek to enforce the Consent Decree.*" (emphasis added)).) Even assuming the wetland at issue in this litigation is beyond the regulatory reach of EPA (on account of its ecological "isolation"),[9] and further assuming EPA has no power to enter into the agreement that eventually was entered as a judgment by this court, Defendants still can not obtain Rule 59(e) relief because "[t]he fact that a party to a consent judgment lacked authority to consent (as defendants contend is true of the [EPA] in light of *SWANCC*) does not void the judgment itself." *Krilich,* 152 F.Supp.2d at 991 (citations omitted). "A judgment is void if it is without subject matter jurisdiction, there was no personal jurisdiction over a party, or the judgment was entered without due process of law." *Id.* On this Rule 59(e) motion, Defendants contest not the subject matter jurisdiction of this court, but rather EPA's regulatory reach, a contention which does not render void the judgments entered in this action. The Consent Decree remains, therefore, what it has always been: a valid and enforceable judgment. (*See* Consent Decree at ¶ 37 ("Upon its entry by this Court, this Consent Decree shall have the force and effect of a final judgment.").)

One can think of this issue another way. EPA, at this stage of the litigation, does not seek to exercise regulatory jurisdiction over the Site. They are merely asserting their rights as a creditor to a judgment previously entered in the form of a Consent Decree. The immediate source of EPA's authority to obtain stipulated penalties in this case is the judgment of this district court entered on January 26, 1999.

### C. Other Issues

Defendants make several additional arguments in their memorandum in support of the Rule 59(e) motion that require a moment to address. First, they assert "[t]here exists a genuine issue of fact as to whether [EPA] consented to delays in the storm water-related tasks." (Mem. at 9.) Assuming *arguendo,* any factual dispute is not material to the matters before the court. In the Consent Decree, the parties specifically provided for the situations where EPA would consent to extending deadlines and the method by which Defendants could obtain consent from EPA.

> b. If the required task has not been completed, Defendants shall submit a written notice in accordance with the requirements of Section VIII (Force Majeure) below. Failure to submit such written notice *shall constitute a waiver of Defendants right to obtain an extension of time* under the provisions of Section VIII (Force Majeure) below. Submission of any notice shall not relieve Defendants of their obligation to comply with any requirement of this Consent Decree.

(Consent Decree at ¶ 23.b. (emphasis added)) The governing provision of the Force Majeure provides as follows:

> 24. If an event occurs which causes or may cause Defendants to fail to comply fully and timely with any requirement of this Consent Decree, Defendants shall notify in writing EPA and the Department of Justice, at the addresses stated in Section X (Addresses for Submissions) below, within fourteen days (14) of the date when Defendants first learned

---

**9.** *But see SWANCC,* 121 S.Ct. at 693–96 (Stevens, J., dissenting) (arguing migratory birds act as the "adjacency factor" linking otherwise isolated wetlands).

of the violation, or within fourteen days (14) of the date when Defendants should have known of the event by the exercise of due diligence. The notice shall describe in detail....

(*Id.* at ¶ 24.)

25. If the parties to this Consent Decree agree that the violation of a provision of this Consent Decree has been or will be caused by circumstances beyond the control of the Defendants ... the time for performance of such provision shall be extended in writing by EPA....

(*Id.* at 25.) Since Defendants have not produced evidence tending to prove they obtained EPA's consent in accordance with the provisions of the Consent Decree, this theory of Rule 59(e) relief fails. *Cf. United States v. A & A Farms,* No. 01–1380, slip op. at 8 (7th Cir. Jan. 18, 2002) ("This provision, however, required A & A to notify the government in writing of the alleged Force Majeure event in order to excuse a deadline. Because A & A failed to do so, A & A cannot now claim that compliance with the schedule was not possible." (citation omitted)).

Next, Defendants insist "[t]he court failed to consider statutory criteria in calculating penalties." (Mem. at 11.) According to Defendants, imposition of stipulated penalties pursuant to a consent decree requires the court to utilize statutory damages criteria. This position has no support in the law of this circuit. In fact, a panel of the Seventh Circuit recently affirmed an approach to stipulated penalties similar to the one undertaken in this case. The panel wrote:

[In] *United States v. Krilich,* 126 F.3d 1035 (7th Cir.1997), ... we upheld the imposition of over $1 million in stipulated penalties. Krilich, a property owner, entered into a consent decree to settle the government's Clean Water Act claims. *Krilich,* 126 F.3d at 1036. In the decree, Krilich promised to restore the subject wetlands according to a schedule. Krilich missed the scheduled deadlines and the government moved to enforce the decree's stipulated penalties provision. *Id.* The district court granted the motion and we affirmed. In so doing, we noted that Krilich had negotiated the decree, entered into it freely, and never properly modified any of the deadlines. *Id.* at 1037. Accordingly, Krilich was bound to pay the stipulated penalties set forth in the consent decree. We believe that the result in *Krilich* is warranted in the instant case.

*A & A Farms,* at 7. Nothing in the text of *A & A Farms* (or, by implication, *Krilich* ) suggests the court must incorporate statutory considerations into the calculation of stipulated penalties, especially if the parties did not make the applicable reference. Introducing factors not previously agreed upon by the parties into the calculation of stipulated penalties would render nugatory the "stipulated" part of the doctrine. Instead, this court analyzed the stipulated penalties framework the parties agreed upon in the Consent Decree, (*See* Consent Decree at ¶¶ 19–22.), and found it reasonable in light of the CWA. *Accord A & A Farms,* at 5 (noting stipulated penalties are enforceable as long as the provisions in the consent decree establishing them are reasonable); *South Suburban Hous. Ctr. v. Berry,* 186 F.3d 851, 856 (7th Cir.1999). Then, the court applied the penalty provisions in the Consent Decree to the circumstances of this case. Since the text of the Consent Decree does not signal this court to incorporate statutory criteria into the penalty-imposing calculus, the court did not do so.

## IV. CONCLUSION

For the foregoing reasons, the September 25, 2001 Order in this action is hereby **VACATED** insofar as it concludes wetland

6 is an "adjacent wetland" as that term is used in CWA jurisprudence. Since this factual determination does not impact the judgment embodied in the Consent Decree or the September 25, 2001 judgment enforcing it, "Defendants' Motion to Alter or Amend Judgment," is hereby **DENIED.**

  **SO ORDERED.**